927 A.2d 543

STEWART A. RICHARDSON, PETITIONER–APPELLANT, v. BOARD OF TRUSTEES, POLICE AND FIREMEN'S RE-TIREMENT SYSTEM, RESPONDENT–RESPONDENT.

Argued October 10, 2006—Decided July 24, 2007.

190

*Stewart A. Richardson,* argued the cause for appellant pro se.

*Michael J. Haas,* Assistant Attorney General, argued the cause for respondent (*Stuart Rabner,* Attorney General of New Jersey,

attorney; *Christine Lucarelli*, Deputy Attorney General, on the brief).

Justice LONG delivered the opinion of the Court.

On this appeal, we revisit the traumatic event standard under the accidental disability retirement provision of the Police & Firemen's Retirement System (PFRS), *N.J.S.A.* 43:16A–1 to 68.[1] Under our current case law, to qualify as disabled by a "traumatic event" a member must prove: (a) that his injuries were not induced by the stress or strain of the normal work effort; (b) that he met involuntarily with the object or matter that was the source of the harm; and (c) that the source of the injury itself was "a great rush of force or uncontrollable power." *Kane v. Bd. of Trs., Police & Firemen's Ret. Sys.*, 100 *N.J.* 651, 663, 498 *A.*2d 1252 (1985). Application of that standard has resulted in confusion and created a body of law with no rational core, thereby compelling this re-evaluation. We recognize that an injury generated by a great rush of force is one example that will satisfy the traumatic event standard, but not the only example. Rather, the traumatic event standard will also be met by a work-connected event that is: (a) identifiable as to time and place; (b) undesigned and unexpected; and (c) caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work). By that paradigm shift, we return to what we believe the Legislature intended in adopting the language of *N.J.S.A.* 43:16A–7—to excise disabilities that result from pre-existing disease alone or in combination with work effort from the sweep of the accidental disability statutes and to continue to allow recovery for the kinds of unexpected injurious events that had long been called "accidents." In so doing, we also provide decision

---

[1] Accidental disability pensions are also offered under the Public Employees' Retirement System (PERS), *N.J.S.A.* 43:15A–43; State Police Retirement System, *N.J.S.A.* 53:5A–10; Prison Officers' Pension Fund, *N.J.S.A.* 43:7–12; and the Teachers' Pension and Annuity Fund (TPAF), *N.J.S.A.* 18A:66–39. Each of those pension systems conditions the grant of accidental disability benefits on satisfying identical standards to those in *N.J.S.A.* 43:16A–7.

makers with a standard capable of consistent and uniform application.

## I.

In January 2003, Stewart Richardson was employed as a corrections officer for the South Woods State Prison in Cumberland County. On January 7, an inmate violently resisted being handcuffed. The two officers at the scene sent an emergency signal to which Richardson and a colleague responded. The officers attempted to subdue the inmate so they could handcuff him behind his back. They succeeded in wrestling the inmate to the ground on his stomach and contained his arms under his chest. Richardson straddled the inmate to hold him down, but the inmate continued to struggle by kicking, punching, and throwing his body around. A colleague attempted to hand Richardson his handcuffs. As Richardson was reaching for the handcuffs, the inmate pulled his arm loose and forcefully jerked up from the ground, knocking Richardson backward. The force caused Richardson to fall back onto his left hand and hyper-extend his wrist.

For approximately one month, Richardson was treated for a sprain until an MRI revealed a complete tear of the ligament. Surgery to repair the ligament was unsuccessful. Richardson's physicians advised him that he could return to work but only on light duty.

In September 2003, Richardson filed an application for accidental disability retirement benefits with the Board of Trustees, PFRS (Board). The Board awarded Richardson an ordinary disability retirement.[2] Although it found that he was permanently disabled and that his disability was the direct result of the

---

[2] A member who is awarded an accidental disability pension receives two-thirds of his annual compensation in benefits. *N.J.S.A.* 43:16A–7(2)(b). An accidental disability is more generous than ordinary disability, which awards approximately forty percent of the member's final compensation. *N.J.S.A.* 43:16A–6(2)(b).

January incident, the Board determined that Richardson did not suffer a traumatic event as required by the statute.

Richardson appealed, and a hearing was held before an Administrative Law Judge (ALJ). Several corrections officers testified about the incident and described it as we have above. Two witnesses testified concerning the issue of whether such violent resistance is a part of the normal course of a corrections officer's duties. Both attested that it was not.

Nonetheless, the ALJ determined that the January incident did not constitute a traumatic event, because Richardson's response was part of the ordinary duties of a corrections officer. The Board adopted that decision. Richardson appealed, and the Appellate Division affirmed, adding that, in its view, Richardson's injury also did not satisfy the great-rush-of-force prong of the traumatic event standard.

We granted Richardson's petition for certification, 186 *N.J.* 364, 895 *A.*2d 451(2006), and now reverse.

## II.

The essential bone of contention between Richardson and the Board is whether the incident in question was a traumatic event under *N.J.S.A.* 43:16A–7(1). More particularly, the parties disagree over whether Richardson's injuries were caused by a great rush of force or uncontrollable power, as required by the third prong of *Kane.* The Board also argues that the incident was a normal part of Richardson's job as a corrections officer and thus could not be a traumatic event under *Kane's* first prong. Richardson disagrees, contending that such violent resistance is not part of the stress and strain of a corrections officer's normal work effort.

## III.

To qualify for accidental disability benefits a member must present a certification from the medical board that he is

permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

[*N.J.S.A.* 43:16A–7(1).]

Thus, the member must be permanently and totally disabled, mentally or physically, from performing his own or *any other* available job. That is an extraordinarily high threshold that culls out all minor injuries; all major injuries that have fully resolved; all partial or temporary disabilities; and all cases in which a member can continue to work in some other capacity. In addition, the injury must occur during and as a result of the member's performance of his job duties, thus eliminating disabilities that are sustained outside of work. Further, the disability cannot be the result of the member's "willful negligence." That is, the member cannot, by action or inaction, have brought about his disability through his reckless indifference to safety.[3]

Those stringent standards carefully circumscribe accidental disability benefits and are relatively straightforward. The final requirement, which is one of causation, is that the disability be a "direct result of a traumatic event." It is the meaning of that language that is at issue here.

## IV.

In interpreting a statute, our overriding goal is to give effect to the Legislature's intent. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). "[T]he best indicator of that intent is the statutory language," thus it is the first place we look. *Ibid.* (citation omitted). If the plain language leads to a clear and unambiguous result, then our interpretive process is over. *Ibid.* Only if there is ambiguity in the statutory language will we turn to

---

[3] *"Willful negligence"* is defined as a "1. [d]eliberate act or deliberate failure to act; or 2. [s]uch conduct as evidences reckless indifference to safety; or 3. [i]ntoxication, operating as the proximate cause of injury." *N.J.A.C.* 17:4–6.5.

extrinsic evidence. *Ibid.* When such evidence is needed, we look to a variety of sources. Central among them is a statute's legislative history. *Id.* at 492–93, 874 *A.*2d 1039.

Generally, courts afford substantial deference to an agency's interpretation of a statute that the agency is charged with enforcing. *R & R Mktg., L.L.C. v. Brown–Forman Corp.,* 158 *N.J.* 170, 175, 729 *A.*2d 1 (1999) (quoting *Smith v. Dir., Div. of Taxation,* 108 *N.J.* 19, 25, 527 *A.*2d 843 (1987)). An appellate court, however, is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." *In re Taylor,* 158 *N.J.* 644, 658, 731 *A.*2d 35 (1999) (quoting *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973)).

Our courts have continuously struggled over the meaning of "direct result of a traumatic event" because that language is susceptible to more than one interpretation. *See Kane, supra,* 100 *N.J.* at 663, 498 *A.*2d 1252; *Cattani v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 69 *N.J.* 578, 585–86, 355 *A.*2d 625 (1976); *Russo v. Teachers' Pension & Annuity Fund,* 62 *N.J.* 142, 154, 299 *A.*2d 697 (1973). Because the plain meaning of the term is ambiguous, we turn to the statute's history.

## V.

As originally enacted, the accidental disability statutes and the Workers' Compensation Act contained similar language, requiring personal injuries caused by an "accident arising out of and in the course of [the] employment." *Gerba v. Bd. of Trs., Pub. Employees' Ret. Sys.,* 83 *N.J.* 174, 181, 416 *A.*2d 314 (1980); *compare L.* 1954, c. 84 § 43 (PERS), *with N.J.S.A.* 34:15–1 (Workers' Compensation Act).[4] Given the similarities between the statutes, "in

---

[4] The other accidental disability statutes required that "the natural and proximate cause of such disability was an accident met in the actual performance of duty," *L.* 1944, *c.* 255, § 7 (PFRS); or that the disability be "the result of personal injuries sustained in or from an accident arising out of and in the course of his employment," *L.* 1955, *c.* 37, § 39 (TPAF). Under current law,

the early applications of the accidental disability provisions of PERS, the courts were influenced strongly by developments in the workers' compensation field." *Gerba, supra,* 83 *N.J.* at 181, 416 *A.*2d 314.

Thus, for nearly a century the cases decided under both statutes defined "accident" in accordance with its ordinary meaning—as "an unlooked for mishap or untoward event which is not expected or designed." *Williams v. Port Auth. of N.Y. & N.J.,* 175 *N.J.* 82, 88, 813 *A.*2d 531 (2003); *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N.J.* 127, 134, 141 *A.*2d 761 (1958); *Spindler v. Universal Chain Corp.,* 11 *N.J.* 34, 38, 93 *A.*2d 171 (1952); *Bollinger v. Wagaraw Bldg. Supply Co.,* 122 *N.J.L.* 512, 519, 6 *A.*2d 396 (E. & A.1939); *Bryant v. Fissell,* 84 *N.J.L.* 72, 76, 86 *A.* 458 (Sup.Ct. 1913). Indeed, historically there was no controversy over the import of the word accident. Within its contemplation were everyday mishaps, including trips, falls, and motor vehicle collisions.

Problems began to arise, however, with the meaning of accident in the workers' compensation context. Employees sought to shoehorn heart attacks into the definition of accident in order to qualify for workers' compensation benefits. Initially, workers' compensation precedent placed barriers to such recovery. It was presumed that a heart attack at work resulted from an employee's pre-existing condition and therefore was not a compensable accident. *Mergel v. N.J. Conveyors Corp.,* 14 *N.J.* 609, 613, 103 *A.*2d 594 (1954); *Lohndorf v. Peper Bros. Paint Co.,* 134 *N.J.L.* 156, 159, 46 *A.*2d 439 (Sup.Ct.1946) *aff'd o.b.* 135 *N.J.L.* 352, 52 *A.*2d 61 (E. & A. 1947). The employee bore the burden of overcoming that presumption by proving that the heart attack was the result of a workplace accident—that is, that an unexpected mishap other than

---

accidental disability provisions also exist in the Prison Officers' Pension Fund, *see N.J.S.A.* 43:7–12, and the State Police Officers Retirement System, *see N.J.S.A.* 53:5A–10. However, those provisions were adopted after 1964 and incorporated the "direct result of a traumatic event" language from their inception.

ordinary work effort caused the attack. *Mergel, supra,* 14 *N.J.* at 613, 103 *A.*2d 594.

However, we abandoned those limitations on workers' compensation recovery in *Ciuba* and *Dwyer v. Ford Motor Co.,* 36 *N.J.* 487, 178 *A.*2d 161 (1962), *superceded in part by statute,* Act of Jan. 10, 1980, *L.* 1979, *c.* 283, § 3. Specifically in *Dwyer,* we rejected the presumption that a heart attack is the result of a pre-existing condition. *Dwyer, supra,* 36 *N.J.* at 512, 178 *A.*2d 161. Moreover, we held that heart attacks precipitated by the *ordinary stress or strain* of the employment met the workers' compensation accident standard. We declared that

> [t]here is *no requirement* that the *work effort be excessive* in the sense of being *unusual or not ordinarily engaged in.* It is enough that *a usual strain* associated with the work was of itself too much at that time because of the condition of the heart, *or that such routine effort in combination with the diseased condition* of the heart produced the collapse.
>
> [*Id.* at 491, 178 *A.*2d 161 (emphasis added).]

By that ruling, we overlaid onto the concept of accident a notion that fundamentally altered what had been its universally-accepted definition. It was no longer limited to unexpected mishaps like falls, banister collapses, and car crashes. It now included heart attacks sustained by workers with longstanding heart disease who were simply doing their jobs at the time of their heart attacks.

In 1963, the Appellate Division applied *Dwyer's* broadened accident definition to the accidental disability statutes. *Fattore v. Police & Firemen's Ret. Sys.,* 80 *N.J.Super.* 541, 550, 194 *A.*2d 363 (App.Div.1963). Citing *Dwyer,* the panel held that accidental disability benefits would be awarded

> if the actual work effort (whether or not unusual for the workman) did in fact materially contribute to the precipitation, aggravation or acceleration of the heart attack, or of any pre-existing heart or circulatory disease, thereby culminating in an attack.
>
> [*Ibid.*]

Thus, after *Fattore,* the term accident in the accidental disability statute was expanded from its well-established meaning to include ordinary work effort that, in connection with pre-existing disease, precipitated a heart attack.

That expanded definition may have been appropriate for workers' compensation, whose purpose is to provide quick and certain recovery to employees for virtually all workplace injuries without litigation or regard to fault. *See N.J.S.A.* 34:15–12; *Russo, supra,* 62 *N.J.* at 146, 299 *A.*2d 697; *Imre v. Riegel Paper Corp.,* 24 *N.J.* 438, 450, 132 *A.*2d 505 (1957). However, it did not fit the purposes of the accidental disability statutes. Those statutes exist to provide greater recompense (above ordinary disability benefits) to workers permanently and totally disabled by an accident in the line of duty. *Cf. Russo, supra,* 62 *N.J.* at 147, 299 *A.*2d 697 (noting that pension plans have different purpose than workers' compensation statutes).

Accordingly, in February 1964, in direct response to the October 1963 *Fattore* decision, the Legislature amended the accidental disability provision of the PFRS[5], *see L.* 1964, *c.* 241, § 4, to excise from the definition of accident the *Dwyer* overlay that *Fattore* had added. The amendment provided:

> (4) Permanent and total disability resulting from a cardiovascular, pulmonary or musculoskeletal condition *which was not a direct result of a traumatic event* occurring in the performance of duty shall be deemed an ordinary disability. [*N.J.S.A.* 43:16A–7(4) (emphasis added).]

Simultaneously, the Legislature amended the definitional section of the statute, *N.J.S.A.* 43:16A–7(1), to conform the main text to the added subsection (4). By those changes, the Legislature intended to make clear that a pre-existing condition that, in connection with work effort, caused injury would not qualify as an accident. *See Cattani, supra,* 69 *N.J.* at 584, 355 *A.*2d 625 (stating that use of traumatic event "plainly indicat[es] the Legislature did not intend that the workmen's compensation concept of 'accident' ... be applied to ... accidental disability pension statute[s]"); *Russo, supra,* 62 *N.J.* at 151, 299 *A.*2d 697 (stating, "[t]his

---

[5] Similar amendments were enacted with respect to the other accidental disability statutes. *See, L.* 1966, *c.* 66, § 2 (revising *N.J.S.A.* 18:13–112.41) and *L.* 1967, *c.* 271 (replacing Title 18 with Title 18A) (*N.J.S.A.* 18A:66–39) (TPAF); *L.* 1966, *c.* 67, § 42 (revising *N.J.S.A.* 43:15A–46) (PERS); *L.* 1969, *c.* 56, § 6 (revising *N.J.S.A.* 43:7–12) (Prison Officer's Retirement System).

amendment was found to reject the concept of *Ciuba* and *Dwyer* that an 'accident' can be found in the impact of ordinary work effort upon a progressive disease"); *Hillman v. Bd. of Trs., Pub. Employees' Ret. Sys.*, 109 *N.J.Super.* 449, 460, 263 *A.*2d 789 (App.Div.1970) (stating that 1966 amendments intended to avoid workers' compensation result by introducing new term traumatic event).

In purpose and in effect, the Legislature rolled back *Fattore* and returned the definition of accident for pension statutes to its well-established meaning by excluding the category of "pre-existing disease plus work effort" and renaming all that remained a "traumatic event." The renaming was necessary to assure that the broadened workers' compensation definition of accident would not creep back into accidental disability jurisprudence. Thus, the meaning of traumatic event for accidental disability purposes (what we formerly called "accident") remained "an untoward event or mishap" that directly caused the member's permanent and total disability.

## VI.

Although the early cases decided under the traumatic event standard were not entirely consonant, they were unanimous in recognizing the limited and specific purpose of the amendments. In *Hillman, supra,* the first accidental disability case to address the amended statute in depth, a maintenance worker with heart disease suffered a heart attack while struggling with an out-of-control loader during a snowstorm. 109 *N.J.Super.* at 451–52, 263 *A.*2d 789. The Board denied accidental disability benefits on the ground that the disability was not the result of a traumatic event. In reversing, the Appellate Division declared that the purpose of the amendments was to limit accidental disability benefits in pre-existing disease cases to those situations where unusual or excessive work effort aggravated or accelerated the disease. *Id.* at 459, 263 *A.*2d 789. The *Hillman* panel formulated a three-part test for traumatic event, requiring that: "(a) the event be identifiable as to

time and place, (b) the injury or disability resulted directly from it, and (c) the event was undesigned, unexpected and unusual." *Id.* at 460–61, 263 *A.*2d 789. Because Hillman's effort was deemed unusual, the court ruled that he had satisfied the traumatic event standard.

Three years later in *Russo, supra,* a widow sought accidental death benefits under PFRS for the death of her husband, who had serious pre-existing heart disease and who suffered a heart attack after light work effort. 62 *N.J.* at 144–45, 299 *A.*2d 697. The Appellate Division held that the husband's death was not accidental. We affirmed and reiterated that the Legislature's purpose in amending the accidental disability statutes was to reject the broadened causation standard of workers' compensation. *Id.* at 149, 151, 299 *A.*2d 697.

In writing for the Court, Chief Justice Weintraub focused on the word accident, which remains in the language of the accidental *death* benefits provision, *see N.J.S.A.* 43:16A–10, and recognized that, after the excision of *Dwyer* and *Fattore,* the terms accident and traumatic event are interchangeable: "[It] would be an apparent novelty, [to have] two concepts of an accident in a single statute, one for disability retirement and the other in cases of death." *Russo, supra,* 62 *N.J.* at 152, 299 *A.*2d 697. The Chief Justice explained that:

> In ordinary parlance, *an accident* may be found either in an *unintended external event* or in *an unanticipated consequence* of an intended external event *if that consequence is extraordinary or unusual* in common experience. Injury by *ordinary work effort* or strain to a diseased heart, although unexpected by the individual afflicted, is not an extraordinary or unusual consequence in common experience. We are satisfied that disability or death in such circumstances is *not accidental* within the meaning of a pension statute when all that appears is that the employee was *doing his usual work in the usual way.*
>
> [*Id.* at 154, 299 *A.*2d 697 (emphasis added).]

Ultimately, we ruled against the petitioner in *Russo* because her husband's heart attack was the result of "doing his usual work in the usual way." In effect, it was essentially caused by his heart condition, not by an external traumatic event.

Thereafter, in *Cattani, supra,* we reviewed the denial of accidental disability benefits to a member who was disabled when he performed unusually strenuous firefighting activity that accelerated his pre-existing heart disease. 69 *N.J.* at 581, 355 *A.*2d 625. The Board held that the firefighter had not experienced a traumatic event and that his condition was the result of his pre-existing disease. *Id.* at 583, 355 *A.*2d 625. The Appellate Division reversed on the ground that the unusual and excessive work effort itself was the traumatic event. *Ibid.*

We rejected that analysis, reasoning that the aggravation of pre-existing disease by any kind of work effort, usual or unusual, was not intended by the Legislature to be considered a traumatic event. We explained that

> The phrase *"traumatic event"* would *ordinarily involve* a mishap or accident involving the application of *some kind of external force* to the body *or* the *violent exposure* of the body *to some external force.*
>
> We recognize that the *foregoing definition may not be all-inclusive* and that a traumatic event may possibly be found in some situations which do not literally fall within the external force or violence concept.... [However, *w]here, as here, the disability is the end result of a preexisting cardiovascular condition, work effort alone whether unusual or excessive, cannot be considered a traumatic event,* even though it may have aggravated or accelerated the preexisting disease. However, a basis for an accidental disability pension would exist if it were shown that the disability directly resulted from the combined effect of a traumatic event and a preexisting disease.
>
> [*Id.* at 586, 355 *A.*2d 625 (emphasis added) (citations omitted).]

Thus, in *Cattani,* we reiterated *Russo's* determination that the statute requires a happening external to the worker (not pre-existing disease alone or in combination with work) to warrant accidental disability benefits. We went on to reject *Hillman* insofar as it included unusual work effort that aggravates or accelerates a pre-existing disease within the notion of traumatic event. Importantly, in *Cattani* we never suggested that a traumatic event could not occur *during* ordinary work effort, only that work effort that aggravates or accelerates pre-existing disease could not be the traumatic event.

Four years later, we decided *Gerba.* Again addressing the amendments, we reaffirmed that their purpose was to extricate

accidental disability benefits from the influence of workers' compensation. *Gerba, supra,* 83 *N.J.* at 185, 416 *A.*2d 314. We held, as we had in *Cattani,* that if a member's disability is the end result of a pre-existing condition plus work effort, the member will not qualify for accidental disability benefits. *Id.* at 186, 416 *A.*2d 314. In other words, work effort alone, usual or unusual, that aggravates or accelerates pre-existing disease is not a traumatic event.

The events for which the member in *Gerba* sought accidental disability benefits included (1) being struck by a truck and falling palettes, and, sometime later, (2) slipping on an oil spot and striking his back against a parked truck. *Id.* at 177, 416 *A.*2d 314. We concluded unequivocally that "[t]here is really no dispute that each of *those incidents did involve the infliction of some external force* upon respondent's body and did in fact *constitute a 'traumatic event.'*" *Id.* at 188, 416 *A.*2d 314 (emphasis added). Likewise, in *Korelnia v. Board of Trustees, Public Employees' Retirement System,* we found the existence of a traumatic event where the member was physically disabled when he slipped and hit his spine on the tailgate of his vehicle. 83 *N.J.* 163, 169, 416 *A.*2d 308 (1980).

Although the members in *Gerba* and *Korelnia* were both denied accidental disability pensions on medical causation grounds, both cases acknowledged that the infliction of "some external force" would be sufficient to satisfy the traumatic event standard. Moreover, in *Gerba* and *Korelnia* we recognized that ordinary falls, and other typical mishaps that in common parlance are called accidents, are core examples of traumatic events, as they had been under the prior versions of the statutes. *See, e.g., Swan v. Bd. of Trs., Teachers' Pension & Annuity Fund,* 85 *N.J.Super.* 226, 228, 204 *A.*2d 371 (App.Div.1964) (awarding accidental-disability retirement to teacher who fell while walking down dark stairway); *O'Keefe v. Bd. of Trs., State Employees' Ret. Sys.,* 131 *N.J.L.* 502, 503–04, 37 *A.*2d 292 (1944) (suggesting fall down stairs would meet accident standard but denying recovery because event not in course of employment).

That understanding of traumatic event provided the Appellate Division with a coherent standard that it was able to apply relatively consistently. *See, e.g., Pollara v. Bd. of Trs., Police & Firemen's Ret. Sys.*, 183 *N.J.Super.* 505, 508–09, 444 *A.*2d 616 (App.Div.1982) (finding fall from fifth stair of stairway when handrail gave way traumatic event); *In re Carlson*, 174 *N.J.Super.* 603, 605, 417 *A.*2d 103 (App.Div.1980) (declaring slip and fall traumatic event); *Toma v. Bd. of Trs., Police & Firemen's Ret. Sys.*, 172 *N.J.Super.* 76, 78–79, 84, 410 *A.*2d 1175 (App.Div.1980) (identifying litany of circumstances that qualified as traumatic events, including lacerations and being thrown to floor by violent inmate); *Titman v. Bd. of Trs., Teachers' Pension & Annuity Fund*, 107 *N.J.Super.* 244, 246, 258 *A.*2d 31 (App.Div.1969) (identifying rope-jumping episode in which teacher injured knee as traumatic event, but later episode where knee collapsed as a result of "degenerative arthritis" not traumatic).

In short, the Appellate Division consistently replicated the view running through our cases from *Russo* and *Cattani* onward that a traumatic event under the 1964 amendments was simply an accident as that term had classically been understood before the *Fattore* overlay was imposed on it. Specifically excepted from the definition of traumatic event was work effort itself that aggravated or accelerated pre-existing disease.

## VII.

Thereafter, we decided *Kane.*[6] There, we concluded that the legislative intent in amending the accidental disability statutes was to limit awards to cases "in which the worker himself is exposed to

---

[6] *Kane, supra*, consolidated three cases: (1) Daniel Kane, while on patrol, inadvertently stepped on an uneven piece of concrete and injured his ankle, 100 *N.J.* at 655, 498 *A.*2d 1252; (2) Donald Canastra, exiting his police car, stepped on a larger than usual stone in the parking lot and wrenched his knee, *id.* at 656, 498 *A.*2d 1252; and (3) Woodrow Minner, while attempting to stanch the flow of an open fire hydrant, repeatedly struck a steel wrench with the palm of his hand to exert more pressure, injuring his wrist, *id.* at 657–58, 498 *A.*2d 1252.

a violent level of force or impact." *Kane, supra,* 100 *N.J.* at 662, 498 *A.*2d 1252. Unsatisfied with the *Cattani* standard's effectuation of that purpose, in *Kane* we enunciated a new three-part test for traumatic event: a worker must demonstrate (1) that his injuries were not induced by the stress or strain of the normal work effort; (2) that he met involuntarily with the object or matter that was the source of the harm; and (3) that the source of the injury itself was a great rush of force or uncontrollable power. *Id.* at 663, 498 *A.*2d 1252. We concluded that none of the accidents under review qualified for accidental disability benefits because they did not involve a great rush of force or uncontrollable power.[7] *Id.* at 664, 498 *A.*2d 1252.

By way of illustrating the new standard, we inflicted a series of hypothetical wounds on a firefighter, noting that he would be eligible for accidental disability benefits if he is "thrown off a building by a sudden explosion or a burst of flames[,] . . . is struck by a falling beam or . . . falls off the top step of a tall ladder." *Id.* at 663, 498 *A.*2d 1252. Conversely, we stated that a firefighter who "is gradually affected by the heat and flames [while battling a blaze over an extended period,] . . . strains his back while lifting a heavy ladder[, or] . . . injures himself while climbing onto the back of the fire truck to retrieve additional hose" would be ineligible. *Ibid.*

In coining the term "great rush of force or uncontrollable power" and making it a prong of the test, we transformed what in *Cattani* had been one example of a traumatic event into the sole example. That, in turn, introduced confusion into what had previously been a workable body of law, leaving our courts struggling to make sense of the new rule.

In 1988, we applied the *Kane* standard in the companion cases of *Maynard v. Board of Trustees, Teachers' Pension & Annuity Fund,* 113 *N.J.* 169, 549 *A.*2d 1213 (1988), and *Ciecwisz v. Board of*

---

[7] In Minner's case, the disability was not met involuntarily and was also deemed simply part of the work effort. *Id.* at 664–65, 498 *A.*2d 1252.

*Trustees, Police & Firemen's Retirement System,* 113 *N.J.* 180, 549 *A.*2d 1218 (1988). Maynard, a teacher, was permanently disabled when she slipped and fell on a highly polished hallway floor, hitting her head on a bench and her back on the floor. *Maynard, supra,* 113 *N.J.* at 170, 549 *A.*2d 1213. Ciecwisz, a corrections officer, was permanently disabled as the result of injuries sustained in three incidents, including a slip-and-fall on cooking oil spilled by inmates. *Ciecwisz, supra,* 113 *N.J.* at 181, 549 *A.*2d 1218. In both cases, the Board denied accidental disability benefits on the grounds that slip-and-fall accidents are not traumatic events. In both cases we agreed, finding that those accidents do not involve "a great rush of force or uncontrollable power." *Id.* at 182, 549 *A.*2d 1218; *Maynard, supra,* 113 *N.J.* at 175, 549 *A.*2d 1213. In ruling, we distinguished an ordinary fall from a standing position from *Kane's* example of a firefighter who falls from the top step of a tall ladder:

> In slip-and-fall cases, no force or power originates anywhere except from the person falling. Any gravitational force that is generated by the fall is not "great," as that term was used in *Kane.* Although a fireman who falls from the top step of a tall ladder also falls as a result of his or her own conduct, the height of the ladder generates a gravitational force that, unlike that of someone who is standing on the ground, is "great."
>
> [*Maynard, supra,* 113 *N.J.* at 175, 549 *A.*2d 1213.]

It was thus in *Maynard* that we introduced the notion of gravitational force into the traumatic event analysis.

The majority's application of the *Kane* standard in *Maynard* and *Ciecwisz* garnered several dissenting opinions. Justice Stein, for example, found in the majority's holding "an unnecessarily restrictive view of the underlying legislative intent." *Ciecwisz, supra,* 113 *N.J.* at 183–84, 549 *A.*2d 1218 (Stein, J., dissenting). Justice O'Hern, joined by Justice Handler, stated:

> [T]he Court has in fact substituted a rule of gravity for traumatic injury—no recovery no matter how violent the force of the blow if you fell less than six feet. Aside from being bad physics, I doubt that the Legislature would intend such an *ad hoc* modification of its qualitative standard for accidental disability benefits.
>
> [*Maynard, supra,* 113 *N.J.* at 179, 549 *A.*2d 1213 (O'Hern, J., dissenting).]

After *Maynard* and *Ciecwisz,* the Appellate Division began to grapple with the concept of "gravitational force," resulting in

veritable jurisprudential chaos both from the perspective of outcome and rationale.

For example, in 1989, the Appellate Division held that two falls of four and five feet satisfied the great rush of force standard. *Quigley v. Bd. of Trs., Pub. Employees' Ret. Sys.*, 231 *N.J.Super.* 211, 219, 555 *A.2d* 642 (App.Div.1989). Perseverating over the *Kane* standard, the panel noted that "at first blush" the facts did not indicate that those falls involved a great rush of force. *Id.* at 217, 555 *A.2d* 642. Comparing the ruling in *Maynard*, that a slip and fall from a standing position does not involve a great rush of force, with the statement in *Kane*, that falling off the top step of a ladder passes muster, the panel conjectured that "the further a body falls, the greater its speed when it strikes the ground and the greater the apparent upward force which the ground exerts to stop the fall." *Id.* at 218, 555 *A.2d* 642. Although it could not determine a height cut-off that per se would be a great rush of force, the *Quigley* panel held that the five- and four-foot falls at issue generated sufficient force to constitute traumatic events.[8] *Id.* at 219, 555 *A.2d* 642.

Only one year later, another Appellate Division panel completely repudiated *Quigley*. *Barney v. Bd. of Trs., Police & Firemen's Ret. Sys.*, 238 *N.J.Super.* 556, 570 *A.2d* 456 (App.Div.1990). In *Barney*, a police officer was disabled when he fell approximately five feet from the top step of a staircase after some bricks gave way. *Id.* at 557, 570 *A.2d* 456. The *Barney* panel held that the *Quigley* analysis of traumatic event was dictum; that it did not properly account for the legislative intent to narrow accidental disability benefits; and that it conflicted with *Kane, Maynard,* and *Ciecwisz*. *Id.* at 558, 570 *A.2d* 456. The *Barney* panel distinguished the case before it from *Kane's* example of falling off the top step of a ladder, concluding that Barney's fall down *stairs* was not a great rush of force because it was "not comparable to the

---

8 Ultimately, however, the court affirmed the Board's final determination denying benefits on the ground that the disabilities were not *direct results* of the traumatic events. *Id.* at 221, 223–24, 555 *A.2d* 642.

*direct and unbroken* fall of an individual from a considerable height with its attendant gravitational forces." *Id.* at 559, 570 *A*.2d 456 (emphasis added). By that reasoning, *Barney* essentially excised a fall down stairs from the scope of traumatic event.

Thereafter, in *Gable v. Board of Trustees, Public Employees' Retirement System,* 115 *N.J.* 212, 557 *A*.2d 1012 (1989), we again addressed the issue of a fall down stairs, among other happenings. There, Stephen Gable, a corrections officer, suffered injuries as a result of several physical struggles with inmates. *Id.* at 215–16, 557 *A*.2d 1012. William Cook, another corrections officer, was also injured when an inmate, whose arm Cook was holding, suddenly jumped and dragged him down a flight of stairs. *Id.* at 218, 557 *A*.2d 1012. We distinguished those cases from *Maynard* and *Ciecwisz;* held that each officer sustained his injuries as the result of a great rush of force or uncontrollable power; and recognized the "actions of an unruly inmate" as the necessary qualifying external force distinct from an employee's "own conduct." *Id.* at 222, 557 *A*.2d 1012.

Confusion over the *Kane* standard continued, however, and, despite their best efforts, courts remained unable to deploy it to reach consistent results. *Compare Fawcett v. Bd. of Trs., Pub. Employees' Ret. Sys.,* 307 *N.J.Super.* 378, 704 *A*.2d 1041 (App.Div. 1998) (holding whiplash from malfunction of seat which lurched backward and forward was great rush of force), *with Pino v. Bd. of Trs., Pub. Employees' Ret. Sys.,* 309 *N.J.Super.* 112, 706 *A*.2d 793 (App.Div.) (concluding whiplash from bus being rear-ended and driver being thrown forward into steering wheel and back against seat not great rush of force), *certif. denied,* 156 *N.J.* 380, 718 *A*.2d 1209 (1998); *compare also Duignan v. Bd. of Trs., Pub. Employees' Ret. Sys.,* 223 *N.J.Super.* 208, 538 *A*.2d 432 (App.Div. 1988) (holding invasion of broom bristles in sensitive organ like eye can be great rush of force), *with Caminiti v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 394 *N.J.Super.* 478, 481, 927 *A*.2d 560, 562, 2007 *WL* 2004943 at *1 (App.Div.2007) (holding finger "deeply stuck" by hypodermic needle in suspect's pocket did not

satisfy standard).  Indeed, the Appellate Division itself has noted its dilemma:

> With all of the shortcomings of [the traumatic event] standard in establishing a fairly ascertainable gauge for determining eligibility for accidental disability pension benefits, and even granting that the judicially crafted three-prong test for satisfying the "traumatic event" standard provides no uniformly workable basis for confidently predicting the outcome in any typical case, we are not at liberty to depart from either.
>
> [*Caminiti, supra,* 394 *N.J.Super.* at 482, 927 A.2d at 563, 2007 *WL* 2004943 at \*2 (citations omitted).]

## VIII.

Those cases are only a sample of the inconsistent decisions that have sprung from the application of the current traumatic event standard.[9]  Those outcomes cannot be reconciled as part of any rational whole.  Indeed, as one commentator aptly put it:

> The term traumatic event .... [t]hough covered in haze ... was not intended to depart significantly from its predecessor, the word "accident."  It has, instead, taken on a life of its own, very likely creating a higher-than-designed hurdle for accidental disability applicants.  Moreover, the current judicial test of traumatic event, as first expressed in *Kane,* requires fine distinctions that are inherently subjective and difficult to apply, encouraging litigation, creating inconsistent results, and enervating the goal of even-handed justice.  The solution is straightforward.  *Kane* and its progeny should be abandoned.  The term traumatic event should be reset into the statutory framework as a low traverse, either by returning to a flexible reading of *Cattani* or by defining the term anew to more closely track the words trauma or accident.
>
> [Solomon Metzger, *Public Sector Accidental Disability Pensions in New Jersey: The Law of Dramatic Events,* 31 *Rutgers L.J.* 491, 508–09 (2000).]

The Appellate Division has expressed a similar sentiment:  "[W]e continue to advocate a re-evaluation of *Kane,* or at least a relaxation of its standards to include situations outside the strictures of

---

[9] Similarly idiosyncratic results have occurred in agency decisions by the Division of Pensions.  By way of example but not limitation, *compare Reed v. N.J. State Police Ret. Sys.,* 93 *N.J.A.R.*2d (Vol. 7) 192 (Div. of Pensions) (finding no great rush of force where chair roller broke and chair fell backward causing member to strike head on air conditioner), *with Zakian v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 91 *N.J.A.R.*2d (Vol. 7) 291 (Div. of Pensions) (finding great rush of force where member lost balance and fell when chair on rollers he reached for "shot out" from under him).

its tripartite test, as *Cattani* suggested might be necessary."
*Dennis v. Bd. of Trs., Pub. Employees' Ret. Sys.*, 394 *N.J.Super.*
484, 492, 927 *A.*2d 564, 569, 2007 *WL* 2004958 at *4 (App.Div.2007).

We agree that our prior jurisprudence is in need of a course
correction. That re-charted course derives, as a matter of first
principles, from the purposes underlying the 1964 amendments to
the PFRS: to undo *Fattore* and keep the loose workers' compen-
sation overlay on accident out of the accidental disability field.
Put another way, in amending the statute, the Legislature sought
to prohibit the grant of accidental disability benefits to a member
disabled by a pre-existing condition, alone or in combination with
work effort, no more and no less. Nothing in the amendments or
the legislative history, by way of substance or temporality, sug-
gests any broader motivation. Certainly, there is no inkling that
the Legislature had any interest whatsoever in altering the centu-
ry-old meaning of the word accident. Indeed, as our case law has
recognized, the terms accident and traumatic event are essentially
interchangeable. *See Russo, supra,* 62 *N.J.* at 152, 299 *A.*2d 697.

Therefore, when our cases have observed that the amendments
were intended to make obtaining accidental disability benefits
"more difficult," *see Kasper v. Bd. of Trs., Teachers' Pension &*
*Annuity Fund,* 164 *N.J.* 564, 576, 754 *A.*2d 525 (2000); *Kane,*
*supra,* 100 *N.J.* at 661, 498 *A.*2d 1252; *Cattani, supra,* 69 *N.J.* at
584, 355 *A.*2d 625; *Barney, supra,* 238 *N.J.Super.* at 558, 570 *A.*2d
456, they were correct but incomplete. The real question is:
"more difficult than what?" The answer is: more difficult than
the broad workers' compensation causation standard that included
heart attacks suffered at work by members with pre-existing heart
disease. Only the pre-existing condition category of qualifying
events (those that *Dwyer* and *Fattore* appended to accident) was
at issue during the amendatory process. Yet, some of our cases
failed to recognize that critical limitation in purpose and persisted
in the entirely wrong notion that the term traumatic event was
intended, in itself, to more significantly narrow the meaning of

accident. As a result, the term has mistakenly been given a more and more parsimonious and idiosyncratic interpretation that is inconsistent with the legislative intent underlying the statute.

We return again to our case law, which, instead of constituting a single plait, is comprised of two distinct strands. We denominate the first strand as the *Cattani* strand. It includes *Hillman, Russo, Cattani, Gerba, Korelnia,* and *Gable.* That strand recognizes the limited purpose underlying the statutory amendments (to exclude *Dwyer* and *Fattore*); declares that, where the disability arises out of a combination of pre-existing disease and work effort, a traumatic event has *not* occurred; underscores that what is required is a force or cause external to the worker (not pre-existing disease) that directly results in injury; and identifies ordinary mishaps, including lacerations, trips, and falls, as traumatic events. That strand reaffirms that a traumatic event can occur *during* usual work effort, but that work effort itself or combined with pre-existing disease cannot *be* the traumatic event.

The second strand consists of *Kane, Maynard,* and *Ciecwisz,* which introduced the great rush of force and gravitational concepts into the accidental disability realm. Those cases are based on a more expansive conception of the legislative intent underlying the amendments: to narrow what qualifies as a traumatic event to only those cases involving an extreme amount of force or violence. Although the Legislature certainly intended accidental disability to apply to such cases, there is no indication that it intended to limit accidental disability awards only to those extreme cases. Thus, *Kane's* third prong overlooked *Cattani's* conclusions that the application of "*some kind* of external force" would pass muster and that some cases would satisfy the standard without any force at all.

Attempting to rebraid those two unraveled strands is no mean feat. Indeed, it is not possible as an absolute matter because the strands are rooted in fundamentally different conceptions of the underlying legislative intent.

We believe that the *Cattani* strand's view of legislative intent is correct. Therefore, we revisit and reinterpret *Kane* so that it remains faithful to *Cattani*. Indeed, we view the disconnect between *Cattani* and *Kane* as the result of a focus differential. When *Cattani* used the phrase "some kind of external force," the focus was on "external" as it had been in *Russo*. "Force" was meant simply as an external influence or cause outside the member himself. It was not an affirmative requirement of extreme violence; the member did not have to be struck by lightening or hit by a truck. The point was that injury resulting from a member's pre-existing disease, even if combined with the exertions of work effort, was not an *external* force and thus not a traumatic event.

In *Kane,* we refocused the inquiry on "force" as denoting violence, omitted the word "external" altogether from the test, and reframed the inquiry as one involving the *amount* of physical force applied to the member. To that extent, we broke with *Cattani* and with the legislative intent underlying the amendments.

We return to the *Cattani* approach and reinterpret *Kane* so that the "great rush of force or uncontrollable power" notion is simply one example of the kind of happening that will satisfy the traumatic event standard, *but not the only example.* That interpretation will obviate the gravitational analysis introduced in *Maynard* and *Ciecwisz.*

█ Under that shifted paradigm, a traumatic event is essentially the same as what we historically understood an accident to be—an unexpected external happening that directly causes injury and is not the result of pre-existing disease alone or in combination with work effort. Thus, to obtain accidental disability benefits, a member must prove:

1. that he is permanently and totally disabled;
2. as a direct result of a traumatic event that is
   a. identifiable as to time and place,
   b. undesigned and unexpected, and

c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

Importantly, not every case will require a great rush of force. Indeed, no particular amount of force is necessary, and no gravitational force analysis is implicated in the traumatic event standard. Recapping, it seems clear to us that the Legislature amended the accidental disability statutes to return the definition of accident to its pre-*Fattore* state, no more and no less. Thus, a member who is injured as a direct result of an identifiable, unanticipated mishap has satisfied the traumatic event standard.

By way of example, a police officer who has a heart attack while chasing a suspect has not experienced a traumatic event. In that case, the work effort, alone or in combination with pre-existing disease, was the cause of the injury. However, the same police officer, permanently and totally disabled during the chase because of a fall, has suffered a traumatic event. Similarly, the gym teacher who develops arthritis from the repetitive effects of his work over the years has not suffered a traumatic event. His disability is the result of degenerative disease and is not related to an event that is identifiable as to time and place. On the contrary, the same gym teacher who trips over a riser and is injured has satisfied the standard.

## IX.

The Board contends that because subduing an inmate is part of the anticipated work of a corrections officer and was not unexpected or unintended, Richardson cannot satisfy the traumatic event standard. That is a misreading of the statute, which *requires* that the traumatic event occur "during and as a result of the performance of [the member's] *regular or assigned* duties." To be sure, when the "normal stress and strain" of the job

combines with a pre-existing disease to cause injury or degeneration over time, a traumatic event has not occurred. *See Cattani, supra,* 69 *N.J.* at 585, 355 *A.*2d 625; *Russo, supra,* 62 *N.J.* at 151, 299 *A.*2d 697. That is quite different from saying that a traumatic event cannot occur *during* ordinary work effort. Indeed it can. A policeman can be shot while pursuing a suspect; a librarian can be hit by a falling bookshelf while re-shelving books; a social worker can catch her hand in the car door while transporting a child to court. Each of those examples is identifiable as to time and place; undesigned and unexpected; and not the result of pre-existing disease, aggravated or accelerated by the work. Thus, each meets the traumatic event standard. So long as those members also satisfy the remaining aspects of the statute, including total and permanent disability, they will qualify for accidental disability benefits.

■ In sum, the fact that a member is injured while performing his ordinary duties does not disqualify him from receiving accidental disability benefits; some injuries sustained during ordinary work effort will pass muster and others will not. The polestar of the inquiry is whether, during the regular performance of his job, an unexpected happening, not the result of pre-existing disease alone or in combination with the work, has occurred and directly resulted in the permanent and total disability of the member.

X.

■ In this case, the Board conceded from the beginning that Richardson was permanently and totally disabled as the direct result of a work-related incident. The only contested issue was whether that incident constituted a traumatic event. Given the clarified test for traumatic event expressed above and our discussion of work effort, Richardson satisfied the accidental disability statute. While performing the regular tasks of his job as a corrections officer, subduing an inmate, Richardson was thrown to the floor and hyperextended his wrist. As a direct result, he became permanently and totally disabled. The occurrence was (a)

identifiable as to time and place; (b) unexpected and undesigned; and (c) not caused by a pre-existing condition of Richardson, alone or in combination with work effort. In short, Richardson suffered a traumatic event.

## XI.

By our interpretation of traumatic event, we return to the roots of the accidental disability statute, carry out the Legislature's intent, and provide decision makers with a standard they can apply consistently and uniformly. It goes without saying that the remaining constraints of the accidental disability statute (permanent and total disability from the performance of *any* available job; work-relatedness; and non-willful negligence) will continue to strictly circumscribe entitlement to accidental disability benefits.

We reverse the judgment of the Appellate Division and remand this matter to the Board for disposition consistent with the principles to which we have adverted.

*For affirmance and remandment*—Justices LONG, LaVECCHIA, ALBIN, WALLACE, and RIVERA-SOTO—5.

*Opposed*—None.