**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2712-23

JEFFREY ALMEIDA,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
STATE POLICE RETIREMENT
SYSTEM,

     Respondent-Respondent.

_____

Argued February 25, 2025 – Decided June 24, 2025

Before Judges Sumners and Bergman.

On appeal from the Board of Trustees of the State Police Retirement Board, Department of the Treasury, SPRS No. xx5165.

Lauren Sandy argued the cause for appellant (Crivelli Barbati & DeRose, LLC, attorneys; Lauren Sandy, of counsel and on the briefs).

Matthew Melton, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant

Attorney General, of counsel; Matthew Melton, on the brief).

PER CURIAM

Petitioner Jeffrey Almeida, a retired New Jersey State Trooper, appeals the final agency decision by the Board of Trustees, State Police Retirement System (the Board) denying him accidental disability retirement benefits under N.J.S.A. 53:5A-10(a). To secure accidental disability retirement benefits under the statute, an applicant must prove five elements. Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 212-13 (2007). The Board adopted the initial decision of the Administrative Law Judge (ALJ), denying Almeida's application because he failed to show two of those elements: (1) the accident was not a traumatic event, specifically, it was not undesigned and unexpected; and (2) his disability was the result of his willful negligence. While we disagree that the accident was not undesigned and unexpected, we affirm because we conclude there is sufficient credible evidence in the record to support the Board's factual findings that the accident was caused by Almeida's willful negligence. See El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 169 (App. Div. 2005) (recognizing our function as an appellate court is to review orders and decisions, not opinions, and that we can affirm those decisions without adopting the trial court's legal reasoning).

I

On April 3, 2017, at approximately 3:23 p.m., Almeida was working as a state trooper and driving a marked patrol car eastbound on Interstate 78 when he was involved in a motor vehicle accident with Marquis Godfrey. The tragic accident left him completely and totally disabled.

Over three years later, Almeida applied for accidental disability retirement benefits with the State Police Retirement System. The Board denied the application on the grounds that the accident was not undesigned and unexpected and Almeida was willfully negligent. The Board instead granted him ordinary disability retirement benefits. Almeida appealed, resulting in the matter being transmitted to the Office of Administrative Law for a contested hearing.

Because his injuries effected his memory, Almeida was unable to testify before the ALJ about the accident. The ALJ was left to consider the testimonies of Almeida's expert witness Robert Klingen, a retired police chief and expert witness in accident reconstruction and police procedure, and Board witness State Police Detective Sergeant Daniel Wojcik, the lead investigator from the State Police's fatal accident investigation unit. The ALJ found both Klingen and Det. Sgt. Wojcik "testified credibly."

Det. Sgt. Wojcik testified that he responded to the crash scene and reviewed "all pertinent information," including roadway evidence, vehicle evidence, digital in-car video recording (DIVR), witness statements, and a memorandum from the Somerset County Prosecutor's Office.[1] He concluded neither drivers' conduct was reckless under state criminal law.

Godfrey, who was driving a black Acura in the left lane of the highway's eastbound three lanes moments before the accident, gave a statement to Det. Sgt. Wojcik that he was traveling between 65 and 70 miles per hour when he saw "a [state] trooper coming fast behind him from a distance with his lights on." The roadway's speed limit was 65 mph. Godfrey believed he was being pulled over and slowed his vehicle and moved it over to the left, with his left-side tires on the grass median and right-side tires still on the pavement. Godfrey stated he was either "stopped or traveling less than 10 miles per hour" when the state trooper's car "came around him . . . [and] hit the right front of his vehicle" after a "red tractor pulling a white trailer in the middle lane . . . prevented [Almedia]

---

[1] Although Almeida had the burden of proof and presented his case first, we first discuss Det. Sgt. Wojcik's testimony for convenience. See Richardson, 192 N.J. at 212.

. . . from passing him in the middle lane." Godfrey also said that, although he saw Almeida's overhead lights activated, he "did not hear any siren."

Romeo Gallo was the only other witness who provided a statement to Det. Sgt. Wojcik. He stated he was traveling in the far-right eastbound lane on I-78 when he saw Almeida's patrol car traveling "pretty fast" and "thought that he was on a call based on his speed." Gallo said there was a black Acura in the left lane, and as Almeida approached the Acura, the Acura slowed down and pulled to the left, causing Almeida to "los[e] control," fishtailing right and then left before hitting the Acura and crashing into a tree in the median. Gallo initially stated he thought the patrol car had its sirens on but then said, "he did not recall if they were on."

Det. Sgt. Wojcik testified the powertrain control module and Bosch Crash Data Retrieval tool on Almeida's vehicle revealed Almeida was traveling at speeds ranging from 105 to 108 miles per hour from about 25.4 seconds to 9.6 seconds prior to the crash. Then, starting from 9.6 seconds before the crash, there is "on and off brake activity, where [Almeida] begins to slow the vehicle." Det. Sgt. Wojcik stated there was no indication in the state police records that Almeida was responding to a call when the crash occurred.

5

In reviewing the last available video clip prior to the crash, taken from Almeida's DIVR approximately eight minutes before the crash, Det. Sgt. Wojcik determined Almeida was traveling at approximately 96 mph in the eight-second video. He also testified there are several ways a trooper vehicle's DIVR camera is turned on, but he believed it was triggered when Almeida turned on his overhead lights, "because the lights were activated" in the video. He further testified there was no indication Almeida was pursuing anyone at the time, conducting stationary radar, nor trying to catch up to a vehicle because there were no computer-aided dispatch (CAD) entries showing he was responding to a call. He acknowledged that state troopers activate their overhead lights for motor vehicle stops, and they are not required to call the stop to dispatch, thereby creating a CAD entry, until it is "safe" to do so. That aside, he concluded Almeida was traveling at an "excessive speed for . . . no apparent reason." But Det. Sgt. Wojcik acknowledged there is no "situation in traffic laws" where it is proper for Godfrey to yield to the left for an emergency vehicle, and such a reaction would be "unexpected" for Almeida.

Det. Sgt. Wojcik concluded the crash was preventable and because Almeida was driving at a "reckless" high rate of speed—105 to 108 mph—before braking as he approached Godfrey, "[h]e failed to maintain directional control

6

of his vehicle." He stated Almeida violated New Jersey State Police Standard Operating Procedure (SOP) C18, which provides:

> The safe operation of any assigned Division vehicle is of paramount importance. All members shall comply with all motor vehicle laws at all times. Particular care should be given when responding to a call for service while acting in an official police capacity, especially at intersecting roadways (e.g., stop signs, traffic signals).
>
> **NOTE**: In accordance with N.J.S.A. 39:4-91.b, the driver of any authorized emergency vehicle is not relieved from the duty to drive with due regard for the safety of all persons, nor does the statute protect the driver from the consequences of their reckless disregard for the safety of others.

Det. Sgt. Wojcik was unaware if Almeida was disciplined for allegedly violating the SOP, or if he had any other prior disciplinary violations. He recognized that state troopers are permitted to exceed the speed limit to "close the gap" between them and a motor vehicle to effectuate a stop, and that troopers are not required to have their sirens on in doing so.

Almeida's expert Klingen agreed with Det. Sgt. Wojcik's assessment of the "time distance analysis" and "dynamics of the crash." However, he opined that the pre-crash data shows "six seconds of controlled braking, where [Almeida's] speed is reduced down to 70 miles per hour," and that his speed at the time of impact was 56 mph. He emphasized that "controlled braking" meant

7

Almeida applied his brakes "intermittently," which is typically how troopers are taught to stop, and is "a much more controlled stop than just a forceful braking." Klingen opined that the "rate at which [Almeida] . . . was slowing is not consistent with a panicked stop," and, to the contrary, "[t]here's no evidence that [he] was out of control at that point."

Klingen stressed that Godfrey, in yielding to the left instead of the right, "violated New Jersey 39:4[-]92, which indicates you must pull to the right to yield to an emergency vehicle." Like Det. Sgt. Wojcik, he stressed "there are no incidents where someone's permitted to yield to the left. . . . The law is clear, the vehicle needs to pull to the right[-]hand side."

Klingen concluded:

> [T]he cause of this crash was the improper, unlawful and unsafe movement of the Godfrey vehicle to the left where it began to slow down and stop, either on the left shoulder or partially in the lane rather than lawfully moving his vehicle to the right to clear the way for [Almeida] to pass. The evidence is clear [t]rooper Almeida had his red lights activated. There's evidence . . . that he may or may not have had his siren on at . . . the time of the crash.
>
> . . . .
>
> [A]t the time of the crash, . . . Almeida was not traveling at 108 miles an hour. He had reduced his speed safely and reasonably to 70 miles per hour before [the crash].

Klingen opined "[t]here was a reason" Almeida was "traveling that fast" and "had his lights on," and "the only potential scenario was that he was trying to effect a traffic stop to go after a violator."

Klingen further testified that Almeida was "not required to call in the fact that he was attempting to stop a vehicle until he could identify that vehicle and call in the specifics of it." Klingen opined that pre-stop calls to dispatch are only made if the state trooper believes the violator is attempting to allude him. Klingen stressed state troopers "are trained to operate vehicles at high speeds," and concluded Almeida's speed was "not unreasonable given the circumstances" and he did not violate any SOPs.

In reaching his initial decision, the ALJ applied <u>Richardson</u> and determined Almeida was not entitled to accidental disability retirement benefits because his accident was "<u>not</u> undesigned and unexpected" as he "was traveling at a high rate of speed with his vehicle's emergency lights on and <u>without</u> <u>emergency sirens activated</u>. . . . in such a manner for no conceivable purpose." The ALJ found Almeida's driving was a "reckless act contribut[ing] to the accident that caused Almeida's permanent injury," thereby constituting "willful negligence." The ALJ recognized that Godfrey's failure to properly yield to the right obstructed the left-hand lane for Almeida's passage but determined "the

9

superseding cause of the [accident] . . . was Almeida's decision to travel at a high rate of speed with no [emergency] sirens activated and with his emergency lights on for no articulable reason."

Almeida filed exceptions to the ALJ's decision. The Board's final agency decision adopted, without explanation, the ALJ's decision denying Almeida accidental disability retirement benefits. This appeal followed.

II

Accidental disability retirement benefits "entitle[] a member to receive a higher level of benefits than those provided under an ordinary disability retirement." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 43 (2008). To qualify for accidental disability retirement benefits, a member of the retirement system must demonstrate he or she "is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his [or her] regular or assigned duties." N.J.S.A. 43:16A-7(a)(1).

In Richardson, our Supreme Court held that an individual seeking accidental disability retirement benefits through a government retirement system must establish:

1. that he is permanently and totally disabled;

2. as a direct result of a traumatic event that is
    a. identifiable as to time and place,
    b. undesigned and unexpected, and
    c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[192 N.J. at 212-13; see also N.J.S.A. 43:16A-7(a)(1).]

Our courts have concluded that the words "traumatic event" and "direct result" in the statute reflected the Legislature's intent "to make the granting of an accidental disability pension more difficult." Smith v. State, Dep't of Treasury, Div. of Pensions & Benefits, 390 N.J. Super. 209, 214 (App. Div. 2007) (quoting Kane v. Bd. of Trs., Police & Firemen's Ret. Sys., 100 N.J. 651, 661 (1985)).

We accord deference to the Board's fact-finding, Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 9-10 (2009), and reverse its decision only if it is "arbitrary, capricious, or unreasonable, or . . . lacks fair

support in the record." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). As for "an agency's interpretation of a statute or case law," appellate courts review de novo. Ibid.

## III

Almeida argues the Board applied "an unduly burdensome and overly restrictive interpretation of the 'undesigned and unexpected' element of the traumatic event standard." Citing to Richardson, 192 N.J. at 213, he argues an "identifiable unanticipated mishap" or an "unexpected happening" satisfies the traumatic event standard, and the accident was unusual because "it was unanticipated and unexpected that Godfrey would remain half in the left lane of travel and be traveling at 10 miles per hour." He posits "[s]o long as the traumatic event is separate and apart from any pre-existing disease, accidental disability [retirement] benefits should be granted."

Almeida further argues the ALJ's finding that Godfrey's improper yielding to the left "created a hazardous obstruction of the left lane" and was "an unintended external event" satisfies the undesigned and unexpected element to receive accidental disability retirement benefits. He notes Gallo initially stated Almeida had his sirens on before backtracking, but "[r]egardless of an audible

signal, there is no occasion for a driver to pull over or yield to the left." Almeida's "reaction was due to the Godfrey Acura's <u>unexpected</u> response in pulling over to the left instead of the right." Moreover, it "is not a usual or common occurrence for a driver to be stopped half in the left lane of the highway," and this obstruction "<u>caused</u> the loss of directional control." The "accident was therefore undesigned and unexpected."

We agree with Almeida that the accident was undesigned and unexpected because Godfrey's yielding to the left rather than the right was an "unexpected external happening" that caused the accident and Almeida's injuries. Almeida was involved in a serious car accident while performing his job of patrolling the highway, an identifiable, expected occurrence.

Yet, we conclude Almeida is not eligible for accidental disability retirement benefits because the record supports the Board's determination that his accident was due to his willful negligence. To qualify for accidental disability retirement benefits, the disability cannot be the result of the member's "willful negligence"; that is, "the member cannot, by action or inaction, have brought about his disability through his reckless indifference to safety." <u>Patterson</u>, 194 N.J. at 43 (quoting <u>Richardson</u>, 192 N.J. at 195); <u>see also</u> N.J.A.C. 17:4-6.5.

13                                                      <span>A-2712-23</span>

Almeida argues his "actions were consistent with those which a [state] [t]rooper of ordinary prudence would exercise under similar circumstances." Citing to several final agency decisions, Almeida argues "willful negligence is found where an employee acts in contravention with a supervisor's overt and direct orders," and without "a warning or direct order to the contrary, willful negligence has not been found." Almeida also argues the ALJ found his excessive speed was "reckless enough to constitute negligence," but "the decision did not find the act of speeding or not using sirens amounted to 'willful negligence.'"

The Board's unequivocable finding that "Almeida's willful negligence . . . bar[s] him from receiving accidental disability [retirement] benefits" is supported by credible evidence in the record. Almedia has the burden to show his driving was not willfully negligent. See Richardson, 192 N.J. at 212. However, because of his injuries he was unable to testify about the accident. To determine what happened, Almeida relied on Klingen's expert testimony and challenged Det. Sgt. Wojcik's testimony. Despite finding Klingen's testimony credible, the Board held the testimony of Godfrey, Gallo, and Det. Sgt. Wojcik, along with the documents in evidence and the DIVR video, supported its determination that Almeida's willfully negligent driving warranted denial of his

14

application for accidental disability retirement benefits. We conclude there is no reasonable basis in the record to question the Board's determination that Almeida was driving at an excessive rate of speed for "no articulable reason." There was no indication that Almeida was responding to an emergency or pursuing someone who violated the law. While Godfrey's improper yielding to the left was unexpected and contributed to the accident, the Board's determination that Almeida's willful negligence was "the superseding cause of the incident" is not arbitrary, capricious, or unreasonable and was by credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

15

A-2712-23