STEPHEN F. GABLE, SR., RESPONDENT, v. BOARD OF TRUSTEES OF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, APPELLANT.

WILLIAM COOK, RESPONDENT, v. BOARD OF TRUSTEES, POLICE AND FIREMEN'S RETIREMENT SYSTEM, APPELLANT.

Argued February 14, 1989—Decided May 16, 1989.

*Kathe Flinker Mullally*, Deputy Attorney General, argued the cause for appellant (*Donald R. Belsole*, Acting Attorney General of New Jersey, attorney; *James J. Ciancia*, Assistant Attorney General and *Michael R. Clancy*, Deputy Attorney General, of counsel; *Kathe Flinker Mullally* and *Deborah Klein Davis*, Deputy Attorney General, on the briefs).

*James Katz* argued the cause for respondent Stephen F. Gable, Sr. (*Tomar, Seliger, Simonoff, Adourian & O'Brien*, attorneys).

*Michael D. Schottland* argued the cause for respondent William Cook (*Chamlin, Schottland, Rosen, Cavanagh & Uliano*, attorneys).

*Robert A. Fagella* submitted a brief on behalf of *amicus curiae*, New Jersey State PBA in *Gable v. Board of Trustees of the Police and Firemen's Retirement System* (*Zazzali, Zazzali, Fagella & Nowak*, attorneys; *Robert A. Fagella* and *Richard A. Friedman*, of counsel and on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

These consolidated cases present yet another opportunity to examine the elusive concept of what constitutes a "traumatic event." Respondents Stephen Gable and William Cook, two corrections officers, claim they are entitled to receive accidental-disability retirement benefits under the Public Employees' Retirement System (PERS), *N.J.S.A.* 43:15A–1 to –141, and the Police and Firemen's Retirement System (PFRS), *N.J.S.A.* 43:16A–1 to –68, respectively. It is stipulated that both are totally and permanently disabled as a direct result of incidents that occurred during and as a result of their regular or assigned duties as corrections officers. Accordingly, the sole issue in each case is whether the incidents resulting in injury constitute traumatic events.

I

A. *Gable v. Board of Trustees of the Public Employees Retirement System*

Stephen Gable began working as a corrections officer at the Camden County Jail in April 1980. While employed there, Gable suffered spinal injuries on three separate occasions as a direct result of physical confrontations with violent, unruly inmates.

The first incident occurred on September 26, 1980. Gable had just broken up a fight between two inmates. As he walked one of the inmates back to his cell, the inmate suddenly and unexpectedly threw baby powder in Gable's face, "dramatically impairing" his vision. Gable testified that as he cleared his eyes, he heard a chair scrape on the floor. He thought that he saw the inmate coming towards him swinging a chair. In order to protect the other inmates as well as himself, Gable lunged forward and rammed his shoulder into the inmate's midsection, driving the inmate into a wall. At some point, Gable felt a tremendous pain in his back. Officer Joseph Charles testified

that he saw the inmate strike Gable in the middle of his back with a heavy wooden chair.

The second incident occurred on March 19, 1982. Gable was attempting to arouse a drunken prisoner who was sleeping in a holding cell. As Gable shook the legs of the inmate, the inmate kicked him in the chest, propelling him against a concrete cell wall. Officer Frank Schillig, who witnessed the incident, testified that the inmate "brought all the force of his body into the feet, hit [Gable] and drove him up against the wall."

The final incident occurred on August 10, 1982. Officers Gable and Schillig were "delousing" an incoming inmate in a shower area when the inmate suddenly tried to escape. As he attempted to run away, Gable grabbed him by the head and the inmate put his arm around Gable's neck. Two other corrections officers soon arrived. During the ensuing struggle, the four officers and the inmate collapsed in a pile on top of Gable. As everyone piled on top of him, Gable felt severe pain in his back.

As a result of his injuries, Gable underwent a laminectomy in January 1983, epidural spinal injections in June 1983, and interbody fusion in August 1983. In addition, he was hospitalized for severe spinal pain. In June 1985 Gable was removed from the police academy because he was physically unfit as a result of his back injuries. Consequently, he was forced to leave his job.

Gable filed for accidental-disability retirement benefits under *N.J.S.A.* 43:15A–43. The PERS Board of Trustees denied his claim, and Gable appealed. Because both sides stipulated that Gable had become permanently and totally disabled as a direct result of events occurring during the performance of his regular duties, the only issue was whether each of the three episodes in question constituted a traumatic event. At the hearing before the Administrative Law Judge (ALJ), Gable testified that as a corrections officer his duties involved maintaining the security of the jail, maintaining the security of the inmates, and overseeing activity in the jail. He characterized

his job as essentially "babysit[ting]" for the inmates. Gable acknowledged that the inmates at the Camden County Jail often became unruly. Incidents involving inmate violence sometimes occurred as frequently as three or four times a day, although sometimes weeks passed between incidents. Gable testified, however, that most of the violence occurred between inmates. Only occasionally did it involve corrections officers. Gable acknowledged that the corrections officers at Camden County jail "certainly knew" that physical violence might occur. But he testified that they had also been told that "you're not hired as a punching bag." Moreover, Gable denied that the three incidents leading to his injury were typical:

> As I stated previously many of the altercations when you arrive there its pretty well over. You might tell an individual to move, you're being cuffed. You take on no altercation. One occurred, but you weren't hurt. You really weren't involved. No, these weren't typical. Its not typical to be taken to the hospital.

Officer Schillig testified that corrections officers at the jail were aware of the possibility that they might become involved in altercations while subduing violent inmates. When asked how typical these events were, he testified that in his three years at the jail, he had been involved in only two or three altercations and that there were officers in the facility who never had been involved in an altercation. The ALJ concluded that each of the episodes was a traumatic event. The ALJ found that Gable had satisfied the three-prong test of *Kane v. Board of Trustees, Police and Firemen's Retirement Fund,* 100 *N.J.* 651 (1985), with respect to each incident. The PERS Board of Trustees rejected the ALJ's determination, finding that only the March 19, 1982, ("the sleeping inmate") incident constituted a traumatic event under *Kane.*

The Appellate Division reversed and awarded Gable accidental-disability benefits. It concluded that the injury-producing incidents went beyond the normal stress or strain of a corrections officer's work effort, *Gable v. Board of Trustees,* 224 *N.J.Super.* 417, 423–24 (1988); that Gable had not voluntarily subjected himself to injury, *id.* at 425; and, finally, that each episode involved a great rush of force or uncontrollable power,

*id.* at 426. We granted certification, 113 *N.J.* 346 (1988), to review those determinations.

B. *Cook v. Board of Trustees of the Police and Firemen's Retirement System*

On April 26, 1985, William Cook, a Monmouth County corrections officer, escorted Nancy Allen, an inmate, to the Ocean County Courthouse for arraignment. At the court's request, Cook removed Allen's handcuffs and pressure belt restraints once she arrived in the courtroom. Allen soon became unruly, screaming and flailing her arms about, trying desperately to escape. Officers Cook and Gibbons managed to drag Allen from the courtroom. They did not have time, however, to put on her restraint belt or handcuffs.

The two officers and the inmate soon reached the top of a stairwell. Cook stood to Allen's right, holding her left arm. According to Cook, Allen suddenly jumped, dragging him down the stairs. His back, legs, and upper body banged against the wall and metal railing, and his lower back hit the edge of the stairs. Cook felt a sharp pain in his back. He testified that Allen kept "fighting all the way down the stairs, banging, throwing, trying to get away from us with the elbows, kicking, scratching. She was beserk." Gibbons remembers Allen coming down the stairs quickly, swinging and kicking. He remembers seeing Cook sitting on the stairs, his left leg straight out, his right leg bent underneath. Both officers agreed that Allen was a very large woman, weighing in excess of 185 pounds.

Shaking off intense pain, Cook helped Gibbons move the prisoner through the courtyard of the Ocean County Jail. With the aid of two others, the officers finally succeeded in pushing Allen into a waiting transportation van. Officer Cook immediately filed a report about the incident. Due to his injuries, the day of the incident turned out to be his last day of active duty as a corrections officer.

Officer Cook admitted that prior to that day he had escorted unruly prisoners. He also acknowledged once having participated in a physical-restraining training session. Officer Gibbons, speaking about the April 26, 1985, incident, stated that "I have had worse, believe me."

Cook filed for accidental-disability benefits under *N.J.S.A.* 43:16A-3. The ALJ concluded that the incident was a "traumatic event" under the standards of *Kane* and awarded Cook accidental-disability benefits. The PFRS Board of Trustees denied his application after determining that there was no evidence that the disability was a result of a traumatic event. Instead, the Board, finding that Cook was permanently and totally disabled from the performance of his regular and assigned duties, awarded him ordinary-disability benefits. The Appellate Division reversed and awarded accidental-disability benefits, concluding that Cook had satisfied each prong of the *Kane* test. We granted certification, 113 *N.J.* 363 (1988), and consolidated this appeal with *Gable*.

## II

In construing what constitutes a traumatic event, we have been guided by the Legislature's intent. Prior to 1964, PERS, *L.* 1954, *c.* 84, § 43, and PFRS, *L.* 1959, *c.* 158, § 1, permitted the award of accidental-disability benefits if an enrolled employee was injured in an "accident" arising out of the course of his employment. The requirement of showing an "accident" was interpreted as it was used under the Worker's Compensation Act. *Maynard v. Board of Trustees*, 113 *N.J.* 169, 172 (1988); *Cattani v. Board of Trustees*, 69 *N.J.* 578, 584 (1976).

In the 1960's the Legislature amended the enabling legislation for PERS and PFRS to provide that in order to receive accidental-disability benefits, an employee must establish that he or she is "permanently and totally disabled as a direct result of a *traumatic event* occurring during and as a result of the performance of his regular or assigned duties." (Emphasis supplied).

*See N.J.S.A.* 43:15A–43; *N.J.S.A.* 43:16A–7.[1] We recognized that by substituting the phrase "traumatic event" for "accident," the Legislature intended to make the granting of an accidental-disability pension more difficult. *Kane v. Board of Trustees, supra,* 100 *N.J.* at 661; *Gerba v. Board of Trustees,* 83 *N.J.* 174, 183 (1980); *Cattani v. Board of Trustees, supra,* 69 *N.J.* at 586.

In interpreting the Legislature's intent, we found in *Cattani v. Board of Trustees, supra,* that "the phrase 'traumatic event' would ordinarily involve a mishap or accident involving application of some kind of external force to the body or the violent exposure of the body to some external force." 69 *N.J.* at 586. Thus, in *Cattani* we denied accidental benefits to a fireman who had aggravated a preexisting cardiovascular condition after he was required to perform tasks normally reserved for several persons.

Even after *Cattani,* however, courts still struggled to define a "traumatic event." In *Kane v. Board of Trustees, supra,* we sought to clarify this problem. At the outset we emphasized:

> [W]e remain convinced, as we were in *Cattani,* that the legislature intended that an accidental disability pension ought to be awarded in cases of serious and permanent harm to the worker, in which the worker himself is exposed to a violent level of force or impact.
>
> [100 *N.J.* at 662.]

With this principle in mind we established a test for determining when a traumatic event has occurred:

> We think it consonant with the legislative intent to characterize a traumatic event as one that arises in cases in which a worker involuntarily meets a physical object or some other external matter and is victim of a great rush of force or power that he himself did not bring into motion. As *Cattani* makes clear, the focus of the inquiry is on the event itself rather than the injury. 69 *N.J.* at 586. The force or power must originate from sources other than the injured party. [*Id.* at 663].

---

[1]The Teachers' Pension and Annuity Fund–Social Security Law (TPAF), *N.J.S.A.* 18A:66–1 to –93, contains an identical accidental disability provision. See *N.J.S.A.* 18A:66–39. PFRS was amended in 1964. PERS and TPAF were similarly amended in 1966.

Specifically, under the *Kane* test, an injured employee must demonstrate: (1) that his or her injuries were not induced by the stress or strain of the normal work effort; (2) that he or she met involuntarily with the object or matter that was the source of the harm; and (3) that the source of the injury itself was a great rush of force or uncontrollable power. *Ibid.*

Applying this test, we held that none of the mishaps in *Kane* constituted a traumatic event. The first involved a police officer who twisted his ankle and knee after stepping on an uneven piece of concrete. The second involved a police officer who damaged his knee when he stepped on a large stone. The final mishap involved a police officer who injured his wrist when he struck the handle of a wrench as he attempted to close a fire hydrant.

In *Kane* we also provided several illustrations of what constitutes a traumatic event. For instance, a firefighter gradually affected by heat and flames while battling a blaze is not entitled to an accidental-disability allowance. His injuries are part of the stress or strain of the normal work effort of a firefighter. Likewise, a firefighter who strains his back lifting a heavy ladder or who injures himself climbing onto a fire truck to retrieve additional hose may not receive accidental-disability benefits. In contrast, a firefighter suffers a traumatic event if he is thrown off the roof of a building by a sudden explosion or a burst of flames. His injuries are not part of the stress or strain of normal duty but rather the result of an involuntary mishap involving considerable force and power. Similarly, a firefighter suffers a traumatic event if he is struck by a falling beam or falls off the top step of a tall ladder. *Kane, supra,* 100 *N.J.* at 663.

In two recent opinions we explored the parameters of the third prong of the *Kane* test. *Maynard v. Board of Trustees, supra,* 113 *N.J.* 169 and *Ciecwisz v. Board of Trustees,* 113 *N.J.* 180 (1988), decided on the same day, presented the question of whether a slip-and-fall accident constitutes a traumatic event.

In *Maynard* a high school teacher slipped and fell on a polished floor in a school hallway, striking her head on a bench and landing on her back. The teacher was permanently disabled as a result of that accident. In *Ciecwisz* a corrections officer was permanently disabled after he slipped and fell on some cooking oil spilled purposely by two inmates.

We concluded that a slip-and-fall accident does not constitute a traumatic event because it does not involve "a great rush of force or uncontrollable power." *Ciecwisz,* 113 *N.J.* at 182; *Maynard,* 113 *N.J.* at 175. As we noted, "[i]n slip-and-fall cases, no force or power originates anywhere except from the person falling." *Ibid.* Thus, we denied accidental-disability benefits in both cases.

### III

Unlike *Maynard v. Board of Trustees, supra,* and *Ciecwisz v. Board of Trustees, supra,* however, the instant case does not require us to examine the third prong of the *Kane* test. Here, the corrections officers clearly sustained injuries as a result of "a great rush of force or uncontrollable power." Each incident was caused by a violent external force—the actions of an unruly inmate. This contrasts with *Maynard/Ciecwisz,* where the parties merely slipped and fell, the source of the force or power causing injury coming about as the result of their own conduct. *Maynard, supra,* 113 *N.J.* at 175.

Instead, the present case requires us to explore the first two prongs of the *Kane* test. Specifically, we must determine (1) whether the injuries to Officers Gable and Cook were not induced by the stress or strain of their normal work effort, and (2) whether they met involuntarily with the object or matter that was the source of the harm. Appellant, Board of Trustees, contends that Officer Gable has failed to satisfy either prong. It argues similarly with respect to Officer Cook. We disagree.

The determination of what constitutes the stress or strain of the normal work effort requires a fact-sensitive in-

quiry. Appellant argues that it is part of the stress or strain of a corrections officer's normal work effort to engage in minor scrapes and scuffles while attempting to subdue fractious inmates. According to appellant, this flows from the fact that the essence of a corrections officer's job is to maintain order in a jail and control inmates. Appellant asserts that because the incidents resulting in respondents' injuries were .the sort of minor "scuffles" that occur regularly in a jail environment, respondents should be denied accidental-disability benefits.

We disagree with appellant's characterization of these incidents as mere "scuffles." Respondents were the victims of violent physical assaults. In the September 1980 incident an inmate slammed a heavy wooden chair across Gable's back. In the August 1982 episode several individuals piled on top of Gable after he was wrestled to the floor by an unruly inmate. For his part, Cook was propelled down a narrow flight of stairs by a 185–pound–plus prisoner.

These violent incidents are clearly distinguishable from the sort of commonplace happenings that we determined in *Kane* are part of the stress or strain of the normal work effort: a police officer stepping on a stone; a firefighter climbing onto a fire truck; a firefighter lifting a heavy ladder. Rather, they are similar to our examples of incidents that extend beyond the stress and strain of normal job duties, i.e., a fireman being blown off a roof, falling off the top step of a tall ladder, or being struck by a falling beam.

We recognize that a corrections officer's job is dangerous. There is always the possibility that he or she will be attacked violently by an inmate. Likewise, a firefighter might be struck by a falling beam, blown off a roof, or fall from a tall ladder. These occurrences, however, while occupational hazards, do not occur frequently enough to constitute normal stress or strain. Although a corrections officer, such as Gable or Cook, may realize that there is a "potential that he or she will be called upon to subdue an inmate, an officer does not expect his or her

daily routine will normally involve being struck by an aggressive or escaping inmate." *Gable, supra,* 224 *N.J.Super.* at 423.

██ We are equally unpersuaded by the contention that respondents met "voluntarily" with the objects that were the source of their injuries. Merely by performing their jobs, corrections officers do not "voluntarily" assume the risk of being assaulted by an unruly inmate.

Our previous decisions provide no support for appellant's position that the "involuntary" prong of the *Kane* test should be read broadly to encompass a general "assumption of risk." In *Kane, supra,* and *Maynard/Ciecwisz, supra,* we considered only whether the injured party actually set in motion the object or source of his injury. Thus, in *Kane* the Court denied accidental disability benefits to a police officer who voluntarily subjected his wrist to injury by pounding his open palm against the handle of a steel wrench. 100 *N.J.* at 664. In *Maynard* the Court stated that a slip-and-fall accident, "by its very nature, is not a voluntary occurrence." 113 *N.J.* at 175. In the instant cases, Officers Gable and Cook were the victims of sudden, violent assaults, instigated solely by the actions of others.

██ Policy reasons further support our conclusion that the "involuntary" prong should be read narrowly. We do not want corrections officers to shy away from subduing unruly inmates. Nor do we want to discourage police officers from chasing criminal suspects. If law-enforcement officers act cautiously, they will not get injured—but they will also not be doing their jobs properly, and the public will not be as well protected.

### IV

In conclusion, we affirm the three prong *Kane* test and hold that under that test the incidents in question constitute traumatic events. We find that it is not part of the stress or strain of the "normal" work effort of a corrections officer to be violently assaulted by an inmate. Corrections officers are not hired to be punching bags. Moreover, respondents Gable and

Cook clearly met involuntarily with the object or matter that was the source of the harm—in this case, attacks by unruly inmates. Finally, the source of each injury was a great rush of force or uncontrollable power. Unlike slip-and-fall accidents, the source and power leading to respondents' injuries originated from a source other than the injured party. Because respondents were permanently and totally disabled as a result of a traumatic event, we conclude that they are entitled to receive accidental-disability retirement benefits.

The judgments of the Appellate Division are affirmed.

*For affirmance* —Chief Justice WILENTZ and Justices GARIBALDI, CLIFFORD, HANDLER, POLLOCK, O'HERN, and STEIN—7.

*For reversal* —None.