**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3650-21

NOE PEREZ,

    Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
POLICE AND FIREMEN'S
RETIREMENT SYSTEM,

    Respondent-Respondent.

_____

Submitted May 1, 2024 – Decided May 15, 2024

Before Judges Currier and Vanek.

On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of the Treasury, PFRS No. xx5525.

Alterman & Associates, LLC, attorneys for appellant (Arthur J. Murray, on the brief).

Nels J. Lauritzen, Deputy Director, Legal Affairs, attorney for respondent (Juliana C. DeAngelis, Legal Counsel, on the brief).

PER CURIAM

Petitioner Noe Perez injured his toe during a physical struggle with a suspect while working as a Camden County Police Department officer on September 11, 2016. Perez's application for accidental disability retirement benefits (ADRB), pursuant to N.J.S.A 43:16A-7, was denied in an initial decision by the Board of Trustees (Board), Police and Firemen's Retirement System of New Jersey (PFRSNJ). On further appeal, an Administrative Law Judge (ALJ) concluded Perez "failed to demonstrate that the event which caused his disability was undesigned and unexpected" and affirmed the denial. On June 15, 2022, the Board issued a final administrative determination adopting the ALJ's initial decision denying Perez's application for ADRB. Based on our careful review of the record and prevailing New Jersey law, we affirm.

I.

The parties do not dispute Perez was rendered totally and permanently disabled as a result of the injury. Instead, the parties disagree whether the event leading to Perez's disability was "undesigned and unexpected" as articulated in Richardson v. Board of Trustees, Police & Firemen's Retirement System, 192 N.J. 189, 212-13 (2007), and required under N.J.S.A 43:16A-7(a)(1) to qualify for ADRB.

We glean the salient facts from the record developed at the Office of Administrative Law (OAL) hearing. Perez testified he began working as an officer with the Paterson Police Department in 2005. Throughout his career, Perez attended training at the police academy in Paterson as well as the Federal Law Enforcement Training Academy (the Federal Academy). In 2013, Perez transferred to the Camden County Police Department (CCPD) and was assigned to the Metro Division—Neighborhood Response Team.

Perez testified at the time he joined the CCPD, law enforcement in Camden County was experiencing an increase in problems stemming from drug use within the city, specifically the use of marijuana or tobacco cigarettes dipped in phencyclidine (PCP) referred to as "wet." When asked if there were any other issues facing Camden County at that time, Perez responded:

> Many. High drug. It was—PCP was big. It was so bad, you could smell PCP. We learned about the superpowers that these guys would get under that influence. There's no—pain compliance is big. If you don't have pain compliance when you're trying to subdue the subject, I mean, you can get knocked out and anything could happen.

Perez explained he first learned of pain compliance at the Federal Academy. Using this method, law enforcement was able to target "pressure point[s]" on a suspect in order to "create pain" which would cause the suspect

3

to "give in" and allow themselves to be apprehended by officers. However, when a suspect is under the influence of drugs, specifically PCP, they are much less responsive to pain compliance techniques, which makes them harder to subdue.

On September 11, 2016, Perez was on-duty and the majority of his shift had been a "normal day." Toward the end of his shift, Perez noted "it was kind of warm and when the weather is good, people tend to just get high in the city and use substances." He then heard a call through dispatch that "officers were asking for assistance" at a particular location.

Perez responded to the scene. Once there, he saw the "suspect [was] clearly . . . under the influence of 'wet.'" Perez questioned other officers as to why the suspect had not yet been apprehended. He felt the other officers may have been afraid of the suspect, and he determined he "had to face the beast," meaning he would attempt to apprehend the suspect "alone." Though Perez noted typically multiple officers would work as a team to subdue a suspect they believed to be under the influence of drugs, there was "[n]othing [he] could do" to "get into the other officers' bodies and tell them come help."

After unsuccessfully attempting to verbally calm the suspect, the interaction became physical. The suspect "tried to elbow strike" Perez, but Perez

was "able to gain control and get under him, get under his armpits specifically, and try to do a takedown, which was difficult."

Once the suspect was on the ground, another officer on the scene used a taser gun on him. Because Perez was in physical contact with the suspect, he also felt the effects of the taser, although the suspect did not respond to the tasing. Perez did not find the suspect's failure to respond surprising, because of his experience with PCP users not responding to pain in the same manner as sober people.

Perez began "trying to secure [the suspect] as fast as [he] c[ould]." Other than an officer tasing the suspect, Perez testified he received no help from other officers while he attempted to subdue the suspect. Perez and the suspect engaged in a physical struggle on the ground where the suspect continued "twisting his body," "resisting" and "pivoting." Perez described the suspect as having "the strength of a bull" as "[h]e was throwing his torso, his upper body towards [Perez] to put weight and prevent being pinned down."

At that point, Perez began "trying to use leverage to pin" the suspect which he found to be "very challenging." The suspect "reared back and [Perez] had to compensate" by using his left leg and foot as leverage to pin the suspect to the ground. Despite his prior training and experience, Perez testified he had

5

received "no training" and "no preparation" for an interaction of this nature with a suspect.

Perez did not identify the precise moment during his struggle with the suspect that his injury occurred. Nor did he present medical reports to demonstrate the injury resulted from the force of the suspect's actions. Rather, Perez stated he had to extend his leg and exert additional pressure for leverage because of the suspect's "movement."

> I was losing control at that moment . . . so I needed leverage for that precise moment, to attempt to not—I didn't want to reverse this where he had total gain of the situation because then I would be out of the fight. He'll have control of it.

Perez testified: "As far as the injury, I can't say whether that was the very moment or not." Ultimately, the suspect was subdued, handcuffed, and detained. As Perez began stepping away after the altercation was over, he realized he "was having a hard time walking" and "couldn't put any pressure whatsoever on [his left] foot."

Perez's toe "sustained a full thickness tear of the medial collateral ligament of the first MTP joint, . . . [and] a very prominent partial thickness tear of the lateral collateral ligament." He attempted to return to work, but, even

6

after treatment, his injury rendered him unable to perform his duties. Because there was no opportunity for a reduced assignment, Perez applied for ADRB.

Detective Eddie Pineiro, who worked for the CCPD for twenty-five years, also testified before the ALJ. Pineiro explained officers are trained to determine if a suspect is under the influence of drugs and how to apprehend individuals with excited delirium or a suspect under the influence of drugs such as PCP. Pineiro also testified officers are trained as to how to respond to emotionally disturbed people (EDPs). He testified the appropriate practice is to have more than one officer apprehend such suspects so the person does not harm themself or others.

After the hearing concluded, the ALJ found Perez had "received training on how to handle individuals who resisted arrest or who attempted to flee and learned techniques on how to handle and restrain individuals who were bigger, stronger, and faster than himself." Further, the ALJ concluded Perez's extensive experience as a police officer demonstrated that he was aware suspects could "act erratically and violently, exhibit excessive strength and resist being detained."

As to the September 11, 2016 incident, the ALJ found Perez "responded to a call for backup assistance for an irate emotionally disturbed male," but it

7

was never medically established if the suspect in question was under the influence of PCP or other drugs or "whether the suspect's behavior was due solely to his mental status and lack of medications for a period of time." The ALJ found that upon arriving on the scene, Perez concluded he was going to subdue the suspect himself.

The ALJ summarized the findings of the Board that Perez "met the Richardson criteria [to receive ADRB] with one exception—the incident giving rise to his disability was not a traumatic event, as it was not undesigned and unexpected" because "there was no external force, happening or accident in this case." Instead, the ALJ concluded Perez "was injured while restraining a suspect by using his body as leverage in accordance with his training and experience." Accordingly, the ALJ determined "it was the work of force or work effort by [Perez] himself while attempting to leverage his body to secure the suspect that caused his injury" so "[t]here was no external force, external happening or accident."

As a result, the ALJ concluded Perez "failed to demonstrate that the event which caused his disability was undesigned and unexpected" and recommended "that the Board's denial" of Perez's ADRB application be affirmed. The Board

8

accepted the ALJ's determination and adopted the entirety of the initial decision. This appeal follows.

## II.

On appeal, Perez argues the Board was incorrect in determining the September 11, 2016 struggle with the suspect was not "undesigned and unexpected." Specifically, he asserts his prior training and experience were insufficient for him to have anticipated the events that unfolded, especially as he subdued the suspect largely without the assistance of other officers. Further, Perez contends the Board utilized an impermissibly narrow definition of "undesigned and unexpected" in its consideration of his ADRB application. We disagree.

Appellate "review of [an] administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). "[A]gencies have 'expertise and superior knowledge . . . in their specialized fields.'" Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys., 198 N.J. 215, 223 (2009) (alteration in original) (quoting In re Suspension or Revocation of the License Issued to Zahl, 186 N.J. 341, 353 (2006)). "A reviewing court '"may not substitute its own judgment for the agency's, even though the court might have reached a

different result.'" In re Stallworth, 208 N.J. 182, 194-95 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)).

"[A]n appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Application of Virtua-W. Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). Review of an agency's interpretation of the law is de novo. Russo, 206 N.J. at 27.

### III.

A PFRSNJ member is entitled to ADRB if

> the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.
>
> [N.J.S.A. 43:16A-7(a)(1).]

The Court clarified the factors for our consideration of this analysis in Richardson, 192 N.J. at 212-13, providing new guidance to unify the disparate

10

tests that had previously been applied to ADRB determinations. Under the Richardson standard, in order to qualify for ADRB, an applicant must prove:

1. [they are] permanently and totally disabled;

2. as a direct result of a traumatic event that is

a. identifiable as to time and place,

b. undesigned and unexpected, and

c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing [their] usual or any other duty.

[Mount v. Bd. of Trs., Police and Firemen's Ret. Sys., 233 N.J. 402, 421 (2018) (quoting Richardson, 192 N.J. at 212-13).]

In Richardson, the Court found the "undesigned and unexpected" prong requires either "an unintended external event" or "an unanticipated consequence" of an intended event that "is extraordinary or unusual in common experience." 192 N.J. at 201 (quoting Russo v. Tchrs' Pension & Annuity Fund,

11

A-3650-21

62 N.J. 142, 154 (1973)). "Injury by ordinary work effort," when "the employee was doing [their] usual work in the usual way" does not qualify. Ibid. (quoting Russo, 62 N.J. at 154). In short, "work effort itself . . . cannot be the traumatic event." Id. at 211.

As set forth by the Court in Richardson, the following constitute potential undesigned and unexpected events:

> A policeman can be shot while pursuing a suspect; a librarian can be hit by a falling bookshelf while re-shelving books; a social worker can catch her hand in the car door while transporting a child to court. Each of those examples is identifiable as to time and place; undesigned and unexpected; and not the result of pre-existing disease, aggravated or accelerated by the work. Thus, each meets the traumatic event standard. So long as those members also satisfy the remaining aspects of the statute, including total and permanent disability, they will qualify for accidental disability benefits.

> In sum, the fact that a member is injured while performing his ordinary duties does not disqualify him from receiving accidental disability benefits; some injuries sustained during ordinary work effort will pass muster and others will not. The polestar of the inquiry is whether, during the regular performance of his job, an unexpected happening, not the result of pre-existing disease alone or in combination with the work, has occurred and directly resulted in the permanent and total disability of the member.

> [Id. at 214.]

12

A-3650-21

In Richardson, a corrections officer was injured while attempting to subdue an inmate. Id. at 193. While the officer straddled him, the inmate kicked and punched the officer. Ibid. Eventually, the inmate broke free of the officer's control. Ibid. The inmate jerked up from the ground and knocked the officer backward, injuring him. Ibid. The Court found the officer's injury was caused by a "traumatic event" because the event "was (a) identifiable as to time and place; (b) unexpected and undesigned; and (c) not caused by a pre-existing condition . . . alone or in combination with work effort." Id. at 214-15. See also Moran v. Bd. of Trs. Police & Firemen's Ret. Sys., 438 N.J. Super. 346, 353-55 (App. Div. 2014) (where this court determined a firefighter's injury was caused by an "undesigned and unexpected" event because he was in an unusual circumstance as there were trapped victims and the team that was supposed to handle the situation was delayed); Brooks v. Bd. of Trs., Pub. Emps Ret. Sys., 425 N.J. Super. 277, 279-83 (App. Div. 2012) (reversing the Board's determination it was not "undesigned and unexpected" when a school custodian injured his shoulder after students dropped a 300-pound bench he was helping them carry because it was not part of his regular job duties and the incident was without warning).

A-3650-21

We are satisfied the ALJ did not err in distinguishing Perez's circumstances from <u>Richardson</u> and its progeny. Perez was trained on how to apprehend volatile and unpredictable suspects as part of a core aspect of his job. Through his own testimony, Perez recognized prior to September 11, 2016 he had experience and training on how to restrain individuals who were under the influence of drugs or experiencing a mental health crisis and were actively resisting arrest. Further, he testified to previously using the same maneuver to lodge his foot against another suspect to gain leverage on a different occasion.

Under <u>Richardson</u>, an undesigned and unexpected event must either be "an unintended external event or . . . "an unanticipated consequence of an intended external event if that consequence is extraordinary or unusual in common experience." 192 N.J. at 201 (quoting <u>Russo</u>, 62 N.J. at 154). "Injury by ordinary work effort . . . although unexpected by the individual afflicted, is not an extraordinary or unusual consequence in common experience." <u>Ibid.</u> (quoting <u>Russo</u>, 62 N.J. at 154).

Perez did not testify to a specific external event or identifiable action by the suspect that caused his injury. We conclude Perez has not demonstrated there was an undesigned or unexpected traumatic event as required and defined under N.J.S.A. 43:16A-7(a)(1) and <u>Richardson</u>.

14

We need only briefly address Perez's argument the ALJ adopted an unduly narrow view of the "undesigned and unexpected" requirement in determining he was trained to subdue suspects under the influence of drugs or otherwise experiencing a mental health disturbance.  Perez's reliance on Gable v. Board of Trustees of the Public Employees' Retirement System, 115 N.J. 212, 223-24 (1989), for support of his argument is misplaced.

Preliminarily, Gable predates the guidance set forth in Richardson and its progeny.  And, unlike the circumstances in Gable, where the petitioner corrections officer was attacked by inmates in three separate occurrences,  Perez has not explained how a police officer using their own physical force to subdue a suspect resisting arrest is unexpected.  Rather, Perez testified the environment for policing Camden was "a volatile situation" while he was on-duty.  We see no reason to find the ALJ, and the Board through adopting the decision, applied an unduly narrow interpretation of "undesigned and unexpected" when rendering the decision to deny Perez's ADRB application.

Finally, Perez argues his past interactions with suspects who were under the influence of drugs or experiencing a mental health crisis were insufficient to prove the incident on September 11, 2016 was not undesigned and unexpected.  Perez is correct the determination of whether an incident is undesigned and

unexpected cannot be "resolved merely by reviewing the member's job description and the scope of his or her training." Mount, 233 N.J. at 427. However, he does not proffer any specifics as to how the September 11, 2016 incident constitutes unusual circumstances or anything beyond the typical course of work he was trained to do and regularly performed or that his own force in subduing the suspect did not cause the injury.

Although an incident may be "devastating" to the applicant who has been injured, careful review of governing case law sets forth an injury which culminated from a "sequence of events" that was not "undesigned and unexpected" will not suffice to establish an entitlement to ADRB. Id. at 430-31 (finding "based on [an experienced hostage negotiator's] training, [petitioner] had reason to anticipate that, without prior warning to him, a tactical entry might be made," so he had not experienced an "undesigned and unexpected" event entitling him to ADRB when the suspect was killed by police while on the phone with him).

We are satisfied the Board's adoption of the ALJ's decision denying Perez's application for ADRB was based on the applicable statute and prevailing law as applied to the credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3650-21