**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1827-24

JASON A. RODRIGUEZ,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
POLICE AND FIREMEN'S
RETIREMENT SYSTEM,

      Respondent-Respondent.

_____

Argued January 29, 2026 – Decided March 2, 2026

Before Judges Marczyk, Bishop-Thompson, and Puglisi.

On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of the Treasury, PFRS No. xx5260.

Steven J. Kossup argued the cause for appellant.

Kimberly L. Forino argued the cause for respondent (Gebhardt & Kiefer, PC, attorneys; Kimberly L. Forino, on the brief).

PER CURIAM

Petitioner Jason A. Rodriguez was permanently injured while trying to restrain a combative inmate. He appeals from the February 12, 2025 Board of Trustees (Board) of the Police and Firemen's Retirement System's denial of his application for accidental disability retirement benefits (ADRB). Based on our review of the record and the applicable legal principles, we reverse.

## I.

Petitioner was employed as a corrections officer with the Bergen County Sheriff's Office since 2008. He was promoted to sergeant in 2020. On February 14, 2022, petitioner's coworker, Sergeant Khalid Abdellatif, announced over the radio he was escorting an inmate[1] to the medical unit. Sergeant Abdellatif escorted the inmate with two other officers. Petitioner met Sergeant Abdellatif and the other officers in the medical unit so he could be available in case assistance was needed and stood nearby to observe the situation.

Sergeant Abdellatif explained to the inmate, in front of petitioner, he was in the medical center because he was going to be placed in prehearing detention, but before the officers could do so, he had to undergo a mandatory medical

---

[1] The inmate was wearing a red wristband, which indicates to officers the inmate is considered "high security." However, petitioner testified he did not see the band on the inmate that day, as the inmate was handcuffed behind his back and petitioner was standing in front him.

A-1827-24

evaluation. The inmate began yelling and cursing at the officers, stating he did not want to be evaluated and "just wanted to go" to prehearing detention. Sergeant Abdellatif again informed the inmate he had to be evaluated before he could be placed in detention and directed the inmate to sit in a plastic chair so the nurses could begin the evaluation. The inmate grew more agitated, continued to curse at the officers, and refused to comply with their orders.

Sergeant Abdellatif attempted to calm the inmate, but to no avail. Sergeant Abdellatif next tried to physically direct the inmate to sit in the chair, however, the inmate kicked the chair away and "[h]is aggressive behavior escalated." The officers then placed the chair near the inmate and again tried to sit the inmate in it. At this time, one of the officers called a "level three" over the radio, indicating an inmate and officers were involved in a physical altercation.

The officers managed to get the inmate into the chair, but he continued to resist their control by flailing and attempting to lunge his body out of the chair. At this juncture, petitioner intervened by approaching the inmate, crouching down in front of him, and grabbing the inmate's right leg. The inmate's left leg remained unsecured. Meanwhile, the other officers continued to attempt to restrain the inmate's upper body. However, the inmate, who was still handcuffed

3

A-1827-24

behind his back, began to get out of the chair. As petitioner lifted the inmate's right leg to force him to sit back in the chair, the inmate kicked petitioner's right arm with his left leg. Petitioner then stepped away and yelled out in pain. The inmate was ultimately restrained on the ground by several officers. Due to the severity of the incident, the officers placed the inmate in a restraint chair with leg shackles and a spit mask. Petitioner testified this was the first time he was attacked by an inmate.

Petitioner sought treatment for the injury to his right arm that day in the emergency room. Approximately six months later, he had shoulder surgery. The inmate was later criminally charged with aggravated assault of petitioner and ultimately pled guilty to fourth-degree aggravated assault.

Petitioner filed an application for ADRB in April 2023. In September 2023, the Board granted him ordinary disability retirement benefits, finding he was "totally and permanently disabled from the performance of his regular and assigned duties." The Board acknowledged the traumatic event was "identifiable as to time and place," and petitioner's injury was a result of the incident. It further found the injury "occurred as a result of the performance of his duties" and not the result of his willful negligence. However, it denied

petitioner's application for ADRB because it determined the injury he had suffered was not "undesigned or unexpected."

Petitioner appealed the Board's decision, and the matter was transferred to the Office of Administrative Law for a hearing before an Administrative Law Judge (ALJ). The hearing took place in July 2024. In December 2024, the ALJ issued her initial decision, in which she affirmed the Board's denial of ADRB.

The ALJ found the inmate's "aggressive behavior escalated" during the attempts to restrain him, and he flailed about in the chair and "physically resisted" when the officers tried to subdue him, ultimately kicking petitioner as he tried to secure the inmate's right leg. She further noted:

> The only issue in dispute here is whether the "undesigned and unexpected" prong of the traumatic[]event requirements of the Richardson[2] test has been satisfied with regard to the . . . incident. The Board has conceded . . . petitioner meets the other Richardson factors.
>
> . . . .
>
> While [petitioner] maintains that the inmate's behavior and kick were sudden and unexpected, I am unpersuaded given my review and consideration of the surveillance video, testimony[,] and other evidence presented. Before stepping in to assist in restraining the inmate, [petitioner] observed the inmate's

---

[2] Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189 (2007).

aggressive behavior escalate and [was aware] that a "level three" had been called. He saw the inmate use his feet combatively, and he observed the inmate aggressively resist the officers by flailing and attempting to lunge out of the chair. After witnessing the inmate's combative behavior escalate, and after the inmate had exhibited the use of physical force, . . . [petitioner] stepped in and grabbed the inmate's right leg while the other officers attempted to restrain the inmate's upper body and hold him in the chair. [Petitioner] was aware that the inmate's left leg was . . . unsecured while he held on to and lifted the right leg. The record is unclear why the left leg was . . . unsecured, but given the inmate's behavior, one would reasonably expect that he would continue to kick out, even, or more so, when his leg was grabbed. . . .

. . . The fact that leg shackles and a restraint chair were ordered by [petitioner] after he was kicked does not establish that the event itself was rare, extraordinary, undesigned[,] or unexpected. Moreover, the fact that [petitioner] filed criminal charges against the inmate . . . and that the inmate [later] ple[d] guilty to [the] aggravated assault charge does not bolster [petitioner's] position that the event was undesigned and unexpected.

The ALJ distinguished <u>Richardson</u>, noting the inmate there exerted exceptional force in an "unexpected" manner, whereas in the present case, the inmate whom petitioner was attempting to restrain did not exert exceptional force, and the inmate's behavior was not "unexpected." She concluded, "the injuries suffered by [petitioner] while restraining the inmate were the consequence of his ordinary work effort."

6

Petitioner filed exceptions to the ALJ's decision. On February 12, 2025, the Board adopted the ALJ's decision affirming the Board's denial of petitioner's application for ADRB.

## II.

Petitioner argues on appeal he was disabled as the direct result of a traumatic event that was undesigned and unexpected, and the Board erred in adopting the ALJ's decision denying his ADRB. He asserts the Board incorrectly determined, since the assault and injury occurred during petitioner's regular or assigned duties, the work effort was "ordinary" and was not "undesigned or unexpected." Petitioner further maintains the Board erred in its determination his injury stemmed from "normal work effort."

We are cognizant appellate review of an administrative agency's final determination is limited. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). Our courts generally "recognize that agencies have 'expertise and superior knowledge . . . in their specialized fields.'" Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys., 198 N.J. 215, 223 (2009) (omission in original) (quoting In re License Issued to Zahl, 186 N.J. 341, 353 (2006)).

"[A]n appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that[:] (1)

the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-W. Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). "The burden of demonstrating that the agency's action was arbitrary, capricious[,] or unreasonable rests upon the person challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

Even so, "in reviewing agency actions, an appellate court is 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'" Hemsey, 198 N.J. at 224 (quoting In re Carter, 191 N.J. 474, 483 (2007)). "While we must defer to the agency's expertise, we need not surrender to it." N.J. Chapter of Nat'l Ass'n of Indus. & Off. Parks v. N.J. Dep't of Env't Prot., 241 N.J. Super. 145, 165 (App. Div. 1990). We do not automatically accept an agency's interpretation of a statute or a regulation, and we review strictly legal questions de novo. Bowser v. Bd. of Trs., Police & Firemen's Ret. Sys., 455 N.J. Super. 165, 170-71 (App. Div. 2018).

Petitioner argues the ALJ's factual findings, as adopted by the Board, support the award of ADRB. Specifically, he points out the ALJ found he was

performing his duties at the time he was injured. Petitioner asserts the Board erred in failing to follow Richardson and in denying his application for ADRB.

Petitioner further asserts the Board erred in determining the incident that caused his injury was from "ordinary work effort." He contends it incorrectly interpreted Richardson regarding its discussion of Russo v. Teachers' Pension & Annuity Fund, 62 N.J. 142 (1973). See Richardson, 192 N.J. at 201. He maintains in Russo, our Supreme Court denied the award of ADRB because the decedent suffered a fatal heart attack due to his pre-existing heart condition, which the Court determined "was [solely] the result of 'doing his usual work in the usual way'" and "not by an external traumatic event." See ibid.

Petitioner relies on Gable v. Board of Trustees, Public Employees' Retirement System for the proposition that, although attacks on corrections officers can occur during their course of work, it is not something they expect in their normal routine. See 115 N.J. 212, 224 (1989). Furthermore, he contends the Board erred by finding the incident here was not extraordinary enough to warrant ADRB.

Petitioner alleges the ALJ incorrectly found the inmate did not exert "exceptional force" to trigger the "undesigned and unexpected" threshold. He maintains there is no "specific level of force required" under Richardson, and

only external force is needed.  Since the inmate's act of kicking petitioner directly resulted in his disability, the incident constitutes adequate grounds for awarding ADRB.

Petitioner contends the ALJ's suggestion "[petitioner] should have grabbed both [of the inmate's] legs . . . was unwarranted [and] contrary to [his] training . . . and . . . to the physical evidence which showed another officer was in between the [inmate's] legs . . . when [petitioner] grabbed one [of the inmate's] leg[s]."  He asserts "[t]he ALJ should not have made these . . . speculations," especially because the Board "had already admitted . . . [petitioner] was not willfully negligent in any way."

Petitioner further points out the ALJ determined:  (1) the inmate kicking petitioner was not visible on the surveillance video; and (2) the record was "inconclusive" as to whether the inmate intended to kick him.  He notes the ALJ found he was in fact kicked, making it irrelevant whether the kick was visible on the video.  He also asserts there is no requirement he has to prove the intent of the inmate in order to demonstrate entitlement to ADRB under N.J.S.A. 43:16A-7.  Nevertheless, petitioner notes the inmate admitted his intent to kick him in the subsequent criminal proceeding.  He also relies on the Attorney General Guidelines for the proposition the use of force is never considered

"routine," contrary to the ALJ's finding this incident resulted from ordinary work effort. Petitioner concludes the incident was sudden and unexpected notwithstanding his training.

N.J.S.A. 43:15A-43(a) provides, in part, accidental disability retirement benefits may be obtained "if [an] employee is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties." Our Supreme Court in Richardson clarified the phrase "result of a traumatic event" applicable to N.J.S.A. 43:15A-43(a) by establishing a five-part test a claimant seeking ADRB must satisfy. 192 N.J. at 212-13. The list includes:

> 1.    that [the member] is permanently and totally disabled;
>
> 2.    as a direct result of a traumatic event that is
>
>> a.    identifiable as to time and place,
>>
>> b.    undesigned and unexpected, and
>>
>> c.    caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3.    that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4.    that the disability was not the result of the

member's willful negligence; and

5.     that the member is mentally or physically incapacitated from performing his usual or any other duty.

[Ibid.]

"Thus, a member who is injured as a direct result of an identifiable, unanticipated mishap has satisfied the traumatic event standard." Id. at 213.

In Richardson, the petitioner, a corrections officer, was injured while attempting to subdue an inmate. Id. at 214. The petitioner responded to an emergency call for assistance from officers dealing with an unruly inmate. Id. at 193. They attempted to restrain the inmate so they could handcuff him behind his back, and in doing so, they wrestled the inmate to the ground on his stomach. Ibid. The petitioner straddled the inmate to hold him down, but the inmate continued to struggle by kicking, punching, and throwing his body around. Ibid. As the petitioner reached for a pair of handcuffs, the inmate pulled his arm loose and forcefully jerked up from the ground, knocking the petitioner backwards. Ibid. The force of the fall caused the petitioner to fall back onto his left hand and hyperextend his wrist. Ibid. It was later found the petitioner had suffered a complete tear of a ligament, and surgery to repair the injury was unsuccessful. Ibid.

12

The petitioner filed for ADRB, and the Board denied the application because it found "[the petitioner] did not suffer a traumatic event as required by the statute." Id. at 194. Similarly, "the ALJ determined that the . . . incident did not constitute a traumatic event, because [the petitioner]'s response was part of the ordinary duties of a corrections officer." Ibid. The Board adopted that decision, and this court affirmed, noting the petitioner's "injury also did not satisfy the great-rush-of-force prong of the traumatic event standard." Ibid.

Our Supreme Court reversed, rejecting the Board's argument "that because subduing an inmate is part of the anticipated work of a corrections officer and was not unexpected or unintended, [the petitioner] cannot satisfy the traumatic event standard." Id. at 213. It concluded the Board "misread[]" the statute. Ibid. Instead, the Court stressed the statute's requirement the traumatic event "occur 'during and as a result of the performance of [the member's] regular or assigned duties.'" Ibid. (alteration in original). The Richardson Court recognized "an injury generated by a great rush of force is one example that will satisfy the traumatic event standard, but not the only example." Id. at 192.

The Court also presented several other examples of "undesigned or unexpected" events occurring during a member's regular or assigned duties, stating: "A policeman can be shot while pursuing a suspect; a librarian can be

hit by a falling bookshelf while re-shelving books; [and] a social worker can catch [their] hand in [a] car door while transporting a child to court." Id. at 214. "Each of those examples is . . . undesigned and unexpected," and "[t]hus, each meets the traumatic event standard."[3] Ibid. The Court emphasized the "polestar" of the inquiry was "whether, during the regular performance of [the petitioner's] job, an unexpected happening, not the result of pre-existing disease alone or in combination with the work, has occurred and directly resulted in the permanent and total disability of the member." Ibid.[4]

The Court noted when it previously "used the phrase 'some kind of

---

[3] The Court also discussed other situations to provide guidance. For example, "a police officer who has a heart attack while chasing a suspect has not experienced a traumatic event," because there, "work effort, alone or in combination with pre-existing disease, was the cause of the injury." Id. at 213. Conversely, "the same police officer, permanently and totally disabled during the chase because of a fall, has suffered a traumatic event." Ibid. Additionally, "the gym teacher who develops arthritis from the repetitive effects of his work over the years has not suffered a traumatic event," as "[h]is disability is the result of degenerative disease and is not related to an event that is identifiable as to time and place." Ibid. "On the contrary, the same gym teacher who trips over a riser and is injured has satisfied the standard." Ibid.

[4] The Court further commented, "[i]mportantly, in Cattani[ v. Board of Trustees, Police and Firemen's Retirement System, 69 N.J. 578 (1976)], we never suggested that a traumatic event could not occur during ordinary work effort, only that work effort that aggravates or accelerates pre-existing disease could not be the traumatic event." Id. at 202.

14

external force,' the focus was on 'external' as it had been [used in prior cases]. 'Force' was meant simply as an external . . . cause outside the member himself. It was not an affirmative requirement of extreme violence . . . ." Id. at 212. Indeed, "the member did not have to be struck by lightning or hit by a truck. The point was that injury resulting from a member's pre-existing disease, even if combined with the exertions of work effort, was not an external force and thus not a traumatic event." Ibid.

Moreover, the Richardson Court cited favorably to its prior decision in Gable, noting it "recognized the 'actions of an unruly inmate' as the necessary qualifying external force distinct from an employee's 'own conduct.'" Id. at 208; see also Gable, 115 N.J. at 222. The Court's observations in Gable are instructive here, particularly where it noted:

> We recognize that a corrections officer's job is dangerous. There is always the possibility that [they] will be attacked violently by an inmate. . . . These occurrences, however, while occupational hazards, do not occur frequently enough to constitute normal stress or strain. Although a corrections officer, such as Gable[,] . . . may realize that there is a "potential that [they] will be called upon to subdue an inmate, an officer does not expect [their] daily routine will normally involve being struck by an aggressive or escaping inmate."
>
> [115 N.J. at 223-24.]

A-1827-24

The Court further added, "[m]erely by performing their jobs, corrections officers do not 'voluntarily' assume the risk of being assaulted by an unruly inmate" because they "are not hired to be punching bags." Id. at 224.

Applying the above principles, we conclude the Board, in adopting the ALJ's initial decision, erred in denying petitioner's ADRB. Contrary to the ALJ's determination, the facts in Richardson are substantially similar to the facts in this appeal. Petitioner responded to assist other officers in attempting to subdue a combative inmate, who was kicking and behaving erratically. Moreover, both petitioner here and the petitioner in Richardson sustained an injury generated from their encounter with an inmate and the external force used by the inmate. See 192 N.J. at 192. The effort exerted by the corrections officers in both matters was not part of the normal stress or strain of the job. Furthermore, there is no suggestion petitioner's injury stemmed, in any part, from a pre-existing disease. A police officer getting shot in the line of duty is something we recognize can occur during the course of an officer's work. However, that does not mean the shooting is "expected," thereby removing the traumatic incident from the Richardson framework. So too, while the assault here may have been a recognized occupational hazard for a corrections officer, it was nevertheless undesigned or unexpected for the purposes of Richardson.

16

We further note that although being assaulted may be a work-related risk for corrections officers, we are unpersuaded by the Board's finding petitioner's injury was "the consequence of his ordinary work effort." As noted in Gable, the mere possibility a corrections officer may be subjected to an assault in the course of their employment does not necessarily imply an officer expects to be attacked by a combative inmate during the normal course of their employment. See 115 N.J. at 223-24. Likewise, the Attorney General Guidelines suggest the use of force is never to be considered routine and "shall only be used as a last resort when necessary to accomplish lawful objectives that cannot reasonably be achieved through verbal commands, critical decision making, tactical deployment[,] or de-escalation techniques." See Off. of the Att'y Gen., Law Enf't Directive No. 2021-14, Directive Updating Statewide Use of Force Policy, at 2 (Dec. 28, 2021). Moreover, the only type of force required for an event to qualify as a traumatic event is "an unexpected external happening that directly causes injury." Richardson, 192 N.J. at 212.

The Board contends "despite . . . never being asked to assist, [petitioner] chose to crouch down in front of the inmate while [the inmate] kicked his legs out combatively and [he] grabbed the inmate's flailing right leg only, leaving the

flailing left leg completely unsecured."[5]  To the extent the Board is suggesting

petitioner had no obligation to intervene, we reject that contention.  The Gable

Court noted:

> Nor do we want to discourage police officers from chasing criminal suspects.  If law[]enforcement officers act cautiously, they will not get injured—but they will also not be doing their jobs properly, and the public will not be as well protected.
>
> [115 N.J. at 224.]

Given the facts here are not materially different than those in Richardson,

we are constrained to reverse the Board's final agency decision and direct the

award of ADRB to petitioner.

Reversed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Hanley*

Clerk of the Appellate Division

---

[5] The ALJ noted it is unclear why the inmate's left leg was unsecured during the struggle, and "one would reasonably expect [the inmate] would continue to kick out, even . . . more so, when his [right] leg was grabbed."  Contrary to the ALJ's suggestions, there was no indication petitioner was somehow negligent in grabbing the inmate's right leg, as opposed to both legs, when he became involved in the fracas in an attempt to subdue the inmate.  In fact, the Board acknowledged petitioner's injury was not the result of any willful negligence under the fourth element of Richardson.

A-1827-24