**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2066-22

THERESA CUPO,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION
AND ANNUITY FUND,

     Respondent-Respondent.

_____

Argued May 8, 2024 – Decided August 5, 2024

Before Judges Currier and Susswein.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury, Agency Docket No. TPAF No. xx1033.

Pablo N. Blanco argued the cause for appellant (The Blanco Law Firm, LLC, attorneys; Pablo N. Blanco, on the brief).

Jakai T. Jackson, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Jakai T. Jackson, on the brief).

PER CURIAM

Plaintiff appeals from defendant's February 3, 2023 final decision denying her application for Accidental Disability Retirement Benefits (ADRB). Plaintiff injured her back three times while working as a teacher—a slip and fall injury in 2008; an injury in 2010 that required surgery, incurred while moving a bookcase; and an injury from breaking up a fight between two students in 2012.

Plaintiff and her expert asserted all three incidents contributed to plaintiff's permanent disability. In its initial consideration of plaintiff's application, defendant determined plaintiff was totally and permanently disabled which was a direct result of the 2010 and 2012 incidents. However, the 2010 incident was not "undesigned and unexpected" and, therefore, did not meet the statutory requirements for ADRB. Defendant determined that both incidents had to meet all of the statutory criteria to be eligible for ADRB. Therefore, plaintiff did not qualify for ADRB.

The contested appeal was transferred to the Office of Administrative Law (OAL). The sole issue was whether the 2010 incident was undesigned and unexpected. After a hearing, the Administrative Law Judge (ALJ) found plaintiff's disability was caused by both the 2010 and 2012 incidents but concluded that only the 2012 incident met the statutory requirements for a

2

traumatic event. Because the 2010 incident was not "undesigned and unexpected," it did not qualify for ADRB. Defendant adopted the ALJ's findings and concluded plaintiff had not met the necessary proofs entitling her to ADRB. She was awarded an ordinary disability retirement benefit. We affirm.

I.

We derive the following facts from the testimony presented during the OAL hearing. In September 2008, plaintiff was employed as a teacher for the Jersey City Board of Education (BOE) when she slipped on water that overflowed from a sink in her kindergarten classroom and fell. According to plaintiff, she "was in so much pain" and needed assistance to get up from the ground and stand; she could not walk. She was taken to Concentra Medical Centers[1] where she was treated with medication—painkillers, anti-inflammatories, and muscle relaxers—and underwent a course of physical therapy.

Plaintiff was also treated by Carl P. Giordano, M.D., a back specialist, who ordered an MRI. According to plaintiff, Dr. Giordano told her the MRI showed an L5-S1 herniated disk. He recommended additional physical therapy

---

[1] Concentra Medical Centers is an emergency medical facility utilized by the BOE's staff when they are injured on the job.

for three to four weeks. Plaintiff returned to teaching kindergarten in February 2009, stating she "felt good," was able to perform her teaching duties, and did not have discomfort.

In November 2010, plaintiff was teaching third grade. At the end of the school day, plaintiff moved a bookcase to pick up items that a student had thrown behind it. According to plaintiff, as she pushed the bookcase back, she felt "a sudden pain shoot down [her] back, [and] pins and needles all the way down to [her] feet." She testified:

> [A]s I start to walk to the nurse's office every step became heavier and . . . I just knew I had herniated myself because it felt like somebody was climbing on top of m[e] and more people were climbing on top of me so by the time I got into the office and saw [the nurse] I told her what I had done and what had happened and she immediately filled out the paperwork and sent me straight up to Concentra. I actually got a ride up there because . . . I was afraid I wouldn't be able to drive myself there. So a coworker took me to Concentra and stayed with me.

The following day, plaintiff saw Dr. Giordano who again ordered an MRI. According to plaintiff, she had re-injured the right side of her back in the L5-S1 area. Dr. Giordano prescribed physical therapy and pain medication. When plaintiff did not improve, Dr. Giordano recommended she undergo a laminectomy.

4

Dr. Giordano performed the laminectomy in March 2011. After the procedure, plaintiff stated:

> I was able to go up stairs without issues, I was able to wear heels again. I started to do activities that I had not done before, you know, I was at a wedding, I was dancing, . . . I didn't have to stop dancing from pain. I went on vacation that year, . . . I went scuba diving and snorkeling, I went horseback riding, zip lining, like, my whole summer was pure activity . . . I felt like nothing had ever happened. I felt the way I had felt before the slip and fall in kindergarten. I felt amazing.

Plaintiff was discharged from Dr. Giordano's care in June 2011. She returned to work teaching third grade in September 2011 without restrictions.

In April 2012, plaintiff sustained the third injury to her back. During her lunch duty she fell as she was attempting to break up a fight between two third grade students. Plaintiff testified she was "in excruciating pain."

Plaintiff sought medical treatment at Concentra and then with Dr. Giordano. Dr. Giordano ordered an MRI of plaintiff's back; according to plaintiff she was "herniated on [her] left side."

Plaintiff testified the BOE asked her to take a functional capacity evaluation; the results indicated she was "a high risk and unable to go back to work." The BOE's independent medical evaluator, Richard A. Rosa, M.D.,

F.A.C.S., an orthopedic surgeon, found plaintiff was "totally and permanently disabled."

Because the BOE concluded it could not make any accommodations for plaintiff to return to work because of her high-risk status, it informed plaintiff they were going to file an application for an involuntary accidental disability petition for her. Thereafter, plaintiff filed her own petition for ADRB based on the three incidents.

As to her current condition, plaintiff testified:

> I could not run up and down the stairs like I was prior to April and get the whole house clean. I couldn't pick up after my children, couldn't play with them, my mom had to move in with us to help me do things with them I had younger children at the time and then . . . I wound up having a[] maid come in to help with the house because the house was a wreck, the pain in my back now which is all on my left side, I developed migraines, I could feel the weather . . . I don't wear heels, I'm afraid to do anything that's going to cause that herniation feeling again because I know what that pain is like and it is something you wouldn't want to wish on anyone. . . . I am an observer of life now opposed to somebody who used to do a lot of things. I stand and I watch. I watch my daughter[s] do things, ski, ice skate, roller skate; they want to know why I can't join them and why all these other parents are out there doing things with their children and I'm standing there watching because I can't, because I know that if I fall or hurt myself or bend the wrong way I am herniated and I don't want another surgery and I don't want to be disabled worse than I already am. . . . I didn't want this but this is what

6

I have and I try and deal with it and I try to be positive, happy and upbeat . . . I live with limits and it's sad because I am [forty-five] and I was so young when this all happened and I wanted to be a vibrant[,] energetic[,] athletic person that I was and I can't and I go to the[] gym and I walk and I watch people running and I think to myself, "My god, I wish I could run, I wish I could [do] things[,"] and . . . I just can't because I can't hurt myself, I can't risk hurting myself.

Plaintiff presented a board-certified orthopedic surgeon, Joseph F. Altongy, M.D., as her expert. During his January 18, 2019 examination, Dr. Altongy found plaintiff had limited range of motion particularly when she bent forward, which he attributed to "harm to the lumbar spine, especially intervertebral disc injury."

Dr. Altongy testified that the MRI scan done after the 2008 incident showed there was a "central" herniation of the L5-S1 disc "press[ing] on the nerves in that area"; after the 2010 incident the MRI showed the herniation was "off to the right putting compression on nerve roots" that "are directed to her right leg"; and the MRI done after the 2012 incident revealed the herniation was "to the left" and the disc was "extruded," meaning "some of the material detached." Dr. Altongy opined that all three injuries occurred to "the same intervertebral disc level, L5[-]S1."

A-2066-22

Dr. Alongy explained plaintiff required a foraminotomy, laminotomy, and discectomy after the 2010 injury to remove the herniated disc material, and dissect "the nerve roots that had been under compression by the herniated disc." His understanding was that the surgery "was successful" and that plaintiff's "back pain subsided, radiating pain to the leg subsided[,] and activity resumed well."

In discussing the 2012 injury, Dr. Altongy testified that the herniation was in a different location than seen previously and he described it as "a more serious version of [the] disc herniation . . . called 'extruded.'" He said: "It's not a recurrence of the same injury in the same location. It's a recurrence at the same level, but it's a new injury." He described plaintiff's 2012 injury as "debilitating," causing back and leg pain, and limiting "average activities." Dr. Alongy testified that he

> attribute[d] 10[%] of [plaintiff's] current limitations to the first accident with the central herniation. [He] attribute[d] 40[%] to the second [incident] with the right sided herniation that had surgery. [He] attribute[d] 50[%] of her current limitations to the third accident that caused the left sided disc herniation with the extruded material.

Dr. Alongy stated:

> I believe that the current difficulties are due to the third accident more than any others. But each of those other

8

accidents did cause difficulties and—and limitations. So, I cannot say 100[%] of the difficulty is the third accident, and I cannot say that one or two . . . d[id] not contribute at all. All three contribute[d].

The expert explained he could not state:

100% of her current difficulties are because of that [third incident in] 2012. That's why I think my logic was proper to emphasize the newest one is her real reason . . . but it's affected by episode two and episode one. Or if there had not been a two and a one, I could have said 100[%] related to this accident. And, possible, one did weaken the disc related to two, and two did weaken the disc related to three, and that's why I included all three events in my analysis.

According to Dr. Altongy, plaintiff's prognosis is "[g]uarded or poor." Any future surgery would be "more extensive" and "more serious" than her prior surgery, because it would entail "decompression, fusion[,] and hardware."

On January 3, 2020, Dr. Rosa testified as defendant's expert. Dr. Rosa stated that he examined plaintiff on December 19, 2012, and that, in his medical opinion, plaintiff "was, in fact, totally and permanently disabled in regard to her duties as a teacher." He had since produced a report and several addenda to the report. He stated that "the records indicate that [plaintiff] had sustained a significant disc herniation on November 8, 2010, which ultimately led to her . . . disability."

In discussing the 2010 and 2012 injuries, Dr. Rosa testified:

[A]t the time of [the 2012] incident when she injured her back, that was the final event that made it impossible—that prevented her from returning to work. So, I would say that that one was the more consequential of the two in terms of her ability to return to work.

. . . .

. . . [The 2010 incident] was significant enough to have created an alteration in the mechanics of her spine . . . since she's lost the function of that L5[-]S1 disc. But she was still able to carry out the duties of her profession despite that, but it did cause an alteration in her spine. . . . [In the 2012] incident, she reinjured a spine that was already compromised . . . .

Dr. Rosa elaborated that "had [plaintiff] not sustained the disc herniation at the time of the 2010 incident, it is more likely than not that the 2012 incident . . . would not have had as significant an impact to the point where she would have been totally and permanently disabled." Dr. Rosa found the 2012 incident accelerated or aggravated the L5-S1 disc herniation that occurred in 2010. The L5-S1 abnormality was "more susceptible to . . . injuries in the future."

According to Dr. Rosa, he disagreed with Dr. Altongy's percentage allocation to the three incidents, although he said they were "not unreasonable." Dr. Rosa stated that his opinion differed from Dr. Altongy's, because he found only the 2010 and 2012 incidents were the direct result of her total and permanent disability.

10

Dr. Rosa noted the MRIs taken in 2010 and 2012 "both . . . demonstrate disc herniations at the L5[-]S1," and he opined that the November 2010 incident played a role in the injury plaintiff suffered in the 2012 incident. Dr. Rosa did not attribute much significance to the 2008 incident, stating there were differing interpretations of the MRI taken after that event.

Dr. Rosa further testified,

> [T]he 2012 accident was the straw [that] broke the camel's back. That's the one that resulted in [plaintiff] not being able [to work] . . . I don't think the injury was as severe as the second one, as the 2010 [incident], but it was the one that put her over the top in terms of not being able to return to work.

He agreed there was "a good likelihood" that had the 2012 incident never occurred, plaintiff "might still be working today." However, he also testified that if the 2010 incident did not occur, then the 2012 incident would "most likely not" have been as severe.

## II.

On December 16, 2022, the ALJ issued its order. The ALJ noted that defendant already found plaintiff was totally and permanently disabled from performing her regular job duties, that her disability was the direct result of the 2010 and 2012 incidents, that all "three incidents were identifiable as to time and place," and that the 2008 and 2012 incidents were undesigned and

11

unexpected. Therefore, the sole issue for the ALJ's determination was "whether the . . . 2010 incident was undesigned and unexpected."

In considering the issue, the ALJ "found [Dr.] Altongy's conclusions and the reasoning underlying his conclusions [were] overborne by those offered by [Dr.] Rosa[,] and, on balance, [the ALJ] afford[ed] greater weight to [Dr.] Rosa's testimony and opinions regarding the nature of [plaintiff's] conditions and the cause of her total and permanent disability." The ALJ found Dr. Rosa's testimony was "credible, persuasive, and consistent with other offered evidence." Despite this assessment, the ALJ noted Dr. Altongy was candid in acknowledging all three incidents contributed towards plaintiff's ultimate permanent and total disability.

Because the experts agreed plaintiff's claim for ADRB was based on multiple incidents, the ALJ found plaintiff had to demonstrate each of the incidents was an unexpected and undesigned traumatic event. Since defendant agreed the 2012 incident met the statutory standard for ADRB under N.J.S.A. 18A:66-39(c), plaintiff only had to proffer proofs regarding the 2010 incident.

After considering the facts regarding the 2010 event, the ALJ found plaintiff "intended to move, and did move, the bookcase"—which, plaintiff "described as heavy and loaded with books"; and that her "actions were

12

purposeful and designed" without an "unintended external event occur[ing]," since "the bookcase did not break, make any unexpected movements, or fall on her." The ALJ also found that "although [plaintiff] did not expect that she would be injured when she moved the bookcase, her injury was not an extraordinary or unusual consequence in common experience."

Therefore, the ALJ concluded plaintiff had failed to demonstrate the 2010 incident met the "undesigned and unexpected" standard required under Richardson v. Board of Trustees, Police & Firemen's Retirement System, 192 N.J. 189 (2007), to qualify for ADRB. Therefore, the ALJ affirmed defendant's determination denying the application. On February 3, 2023, defendant adopted the ALJ's decision.

## III.

On appeal, plaintiff contends she is entitled to ADRB because the 2012 incident "was the essential significant or substantial contributing cause of her total disability and because proof that the accident was the exclusive cause is not required." Plaintiff concedes that the 2010 incident was not undesigned and unexpected.

Our review of quasi-judicial agency determinations is limited. Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018).

13

"[C]ourts afford substantial deference to an agency's interpretation of a statute that the agency is charged with enforcing." Richardson, 192 N.J. at 196.

We review an agency decision "under an arbitrary and capricious standard," Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019), meaning we will sustain decisions "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Saccone v. Bd. of Trs. of the Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

The court's role in reviewing an administrative appeal is to determine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto. Grp., Inc., 234 N.J. at 157 (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

14

We are "in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Id. at 158 (alteration in original) (quoting Dep't of Child. & Fams. v. T.B., 207 N.J. 294, 302 (2011)).

Preliminarily, we note that at no time during this extended hearing did plaintiff dispute the ALJ's framing of the sole disputed issue: whether the 2010 incident was undesigned and unexpected. Only on appeal does plaintiff now contend this court should establish a new "legal principle that it is sufficient" to establish "a total disability" from one incident "even though it acts in combination with an underlying quiescent condition."

We decline plaintiff's invitation. Plaintiff asserted in her ADRB application that her disability arose out of all three incidents. Dr. Altongy, plaintiff's expert, not only opined that all three incidents contributed to her total disability but attributed specific percentages to the contribution each incident made to her total disability. Defendant found plaintiff's total disability was a result of both the 2010 and 2012 incidents. Therefore, plaintiff had to demonstrate both incidents meet the statutory standard as further articulated in Richardson.

An application for ADRB is governed by N.J.S.A. 18A:66-39(c), which states,

A member, under [sixty-five] years of age, shall, upon the application of [their] employer or upon [their] own application or the application of one acting in [their] behalf, be retired by the board of trustees, if said member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of [their] regular or assigned duties, on an accidental disability allowance.

In <u>Richardson</u>, our Supreme Court set forth the following five-prong standard for establishing a claim for ADRB, stating that a member must show:

> 1. that [the member is] permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>> a. identifiable as to time and place,
>>
>> b. undesigned and unexpected, and
>>
>> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4. that the disability was not the result of the member's willful negligence; and
>
> 5. that the member is mentally or physically incapacitated from performing his usual or any other duty.
>
> [192 N.J. at 212-13.]

16

The ALJ found plaintiff did not meet the standard as to the 2010 incident. Plaintiff does not contest that finding. Therefore, we need not further analyze the statute or case law regarding that finding. Instead, we turn to plaintiff's newly minted argument that the 2012 incident alone is sufficient to grant plaintiff's ADRB application.

Generally, we will not consider a question or an issue that was not presented to the trial court or, in this case, the OAL "unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." State v. Legette, 227 N.J. 460, 467 n.1 (2017) (quoting State v. Robinson, 200 N.J. 1, 20 (2009)). Here, we will consider plaintiff's fresh legal argument because it is quite plausible that the public has a great interest in the grant or denial of ADRB for public employees.

ADRB "provide[s] greater recompense (above ordinary disability benefits) to workers permanently and totally disabled by an accident in the line of duty." Richardson, 192 N.J. at 199. Therefore, the parameters for an award are narrow and strict. For instance, both the statute and Richardson confirm "that, where the disability arises out of a combination of pre-existing disease and work effort, a traumatic event has not occurred," there must be "a force or cause external to the worker (not pre-existing disease) that directly results in

injury." Id. at 211 (emphasis omitted). If there is no traumatic event, the petitioner is entitled to an ordinary disability retirement benefit.

The facts presented here do not warrant a deviation from the clear language in the statute and Richardson. Plaintiff and both experts found plaintiff was injured in the 2010 and 2012 incidents that resulted in her total disability. Her own expert opined 40% of plaintiff's limitations stemmed from the 2010 incident and 50% arose from the 2012 event. He further stated that the disc was weakened from the 2010 incident. Dr. Rosa's testimony was consistent. He opined if the 2010 incident had not occurred, plaintiff would not have been permanently disabled from her 2012 injury.

This evidence is not nearly enough to satisfy the statute and Richardson standards. At best, plaintiff's expert stated the 2012 injury was only partially (50%) responsible for plaintiff's permanent disability. This is not close to being "the substantial contributing cause" or direct result of her total disability as posited by plaintiff.

The statute and Richardson do not say a petitioner must establish a traumatic event that "substantially" caused a permanent and totally disability. And under these circumstances, where petitioner's expert testimony was that the only proven traumatic event was only partially responsible for her disability, we

A-2066-22

will not create a new paradigm. We are satisfied that defendant properly concluded, given these facts, that plaintiff was not entitled to ADRB because she did not demonstrate the two events that almost equally contributed to her permanent disability were traumatic events.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2066-22